## COMMONWEALTH *vs*. ALFONSO CRUZ.

Suffolk. September 10, 1992. - November 12, 1992.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Homicide. Practice, Criminal*, Capital case. *Malice. Intent. Intoxication. Evidence*, Expert opinion.

At a murder trial that resulted in a verdict of guilty of first degree murder based on extreme atrocity or cruelty, the judge's erroneous ruling, to which no objection was interposed, excluding proffered expert testimony that the defendant's blood alcohol level of 0.19 would have "severely affected" his judgment, warranted relief under this court's broad power of review pursuant to G. L. c. 278, § 33E. [689-691]

At the trial of an indictment for first degree murder, the blood alcohol level permitting a finding of intoxication in motor vehicle cases would not be an appropriate basis for an instruction to the jury on the effects of the defendant's intoxication. [691-692]

INDICTMENT found and returned in the Superior Court Department on January 8, 1988.

The case was tried before *Robert W. Banks*, J.

*Henry F. Owens, III*, for the defendant.

*Jane A. Sullivan*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. On March 29, 1989, a jury in the Superior Court found the defendant guilty of murder in the first degree based on extreme atrocity or cruelty. We agree with the argument made by the defendant's new counsel that the trial judge erred in excluding expert testimony, offered in the form of an opinion, that the defendant's blood alcohol level impaired his mental capacity. That evidence was relevant to the jury's consideration of the defendant's culpability for first degree murder. Although the issue was not fully preserved by the defendant's trial counsel, we conclude that the jury's consideration of the case could have been influenced by the evi-

dence. The defendant, therefore, is entitled to relief pursuant to G. L. c. 278, § 33E (1990 ed.), see *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992), and we order a new trial.

The following summary provides relevant background. The Commonwealth's eyewitness testified that he lived in the Bay Village area of Boston and made his living by dressing in women's clothing and "going out" with men. On October 4, 1987, around 11 P.M., the witness was dressed in "drag" and looking for men near South Charles Street when he encountered, and had a conversation with, the defendant who offered him money for "a date." The offer was rejected. A few blocks from the site of this encounter, approximately twenty minutes later, the eyewitness heard screams. Moving toward the screams, he saw the defendant pulling a woman, later identified as the victim, into a well-lit garage bay toward an open space between two parked automobiles.[1] Keeping the garage bay under surveillance, the eyewitness summoned help. At no time did he see anyone drive out of the area nor did the number of automobiles parked in the bay decrease.

Two Boston police officers arrived. They entered the garage bay and saw the victim lying on the ground. The defendant crouched nearby holding a knife. After having the defendant put down the knife, the police observed that the knife was bloody and that the defendant had what appeared to be bloodstains on his pants, hands, and face. Money taken from the defendant's coat pocket was bloodstained.

The victim had been killed by multiple stab wounds in a manner which would warrant a jury finding of murder by extreme atrocity or cruelty. There was evidence that both the defendant and the victim had type A blood, and that type A blood was found on the knife and one $20 bill taken from the

---

[1]The automobile on the left had been parked in the bay around 11:30 P.M. At that time, according to the testimony of the witness who parked the automobile, there was no one in the garage bay.

defendant.[2] The victim was known to the police by reason of several prior arrests for prostitution. When arrested in the past, she usually was found to carry condoms, cigarettes, and United States currency which she placed inside her boots or shoes. Photographs of her body at the scene showed that one of her boots had been unzipped.

The defendant, a thirty year old Mexican national, testified in his own behalf. He indicated that he had entered California about twenty days before he was arrested and had come to Boston from San Francisco. In Boston, he slept "[i]n churches, in missions." The defendant indicated that on the day of the murder he had consumed twenty or thirty beers. The defendant had been drinking since age thirteen and usually drank beer and whiskey, but only on weekends. The defendant had no memory of eating anything or going to the garage bay on the day of the murder. He claimed he was drunk and asleep in the garage bay when he was awakened by a woman's voice. From the rear he saw some of the cars leaving the area. He testified that he saw the victim and that as he touched her body with his hands, a knife fell off her. The defendant stated that he wiped the blood from his hands on his pants and picked up the knife just before the police arrived. He denied stabbing the victim and claimed that he had no memory of events of the night, including his attempt to solicit the eyewitness.

As part of his case, the defendant called a forensic chemist. During a voir dire on his qualifications, the chemist indicated considerable training and experience in evaluating blood alcohol levels. In addition to other qualifications,[3] his experience included over 200 occasions when the expert had

---

[2] Type O blood was found on clippings from the victim's fingernails. Strands of hair found in the victim's hand did not match the defendant's head hair but were similar to the victim's head hair.

[3] The chemist received a bachelor of science degree in chemistry from Harvard University and a doctoral degree in chemistry from the Massachusetts Institute of Technology. He had lectured at seminars and symposia on how to estimate and measure blood alcohol levels and the effects of alcohol consumption, had evaluated "know your limits" charts for the United States Department of Transportation, and had written and modi-

been called to give opinion testimony in various State, Federal, and foreign courts on blood alcohol concentrations. The forensic chemist also testified that, based on extensive reading in the area, he was qualified to form an opinion "as to how the [amount of] alcohol [consumed] would affect judgment of an individual." Based on the information before him,[4] and certain scientific formulations, the acceptability of which is not challenged, the defendant's expert was prepared to testify that (1) at the time of the incident, the defendant would have had a blood alcohol level of approximately .19; and (2) such a blood alcohol level would have "severely affect[ed]" the defendant's judgment. The judge ruled that he would allow the expert's first opinion, but not the second "because that is . . . an ultimate issue for the jury to decide." This ruling was made without any objection having been interposed by the prosecutor and without objection or argument from the defendant's trial counsel. The prosecutor then stated his understanding to be that the judge would "permit the witness to testify as to only the forensic chemical aspects and not as to whether or not alcohol impaired the judgment of the defendant." That understanding was confirmed by the judge, and the testimony before the jury thereafter proceeded in accordance with the judge's ruling.

1. The judge should have admitted all of the expert's testimony. In a first degree murder trial, a defendant may show that he was so far overcome by intoxicating substances as to be rendered incapable of forming the intent or knowledge necessary to commit premeditated murder, or murder with extreme atrocity or cruelty, and, based on such evidence, a jury would be warranted in returning a verdict of second de-

---

fied chapters in a text on defending clients charged with driving while intoxicated.

[4]In reaching his opinions, the expert had reviewed police reports and the result of a breathalyzer examination administered to the defendant by the Boston police about five hours after his arrest. The defendant registered a .07 on this test. The expert had also seen a photograph taken of the defendant on the night of his arrest and had considered the defendant's courtroom testimony about the night of the murder.

gree murder, if they were satisfied beyond a reasonable doubt that all other elements of the crime had been proved. See *Commonwealth* v. *Sires, ante* 292, 298-301 (1992); *Commonwealth* v. *Sama,* 411 Mass. 293, 297-299 (1991); *Commonwealth* v. *Doucette,* 391 Mass. 443, 455-456 (1984). Consistent with these principles, the defendant presented evidence raising a substantial claim that, because of intoxication, he lacked capacity to commit deliberate, premeditated murder or murder with extreme atrocity or cruelty, and the jury were instructed (and reinstructed during deliberations at their request) on the subject. The judge excluded the evidence, not on the basis of lack of qualification of the defendant's expert, but because he thought the opinion improperly intruded on the jury's consideration of an ultimate issue.[5] However, "expert testimony . . . is admissible whenever it will aid the jury in reaching a decision, even if the expert's opinion touches on the ultimate issues that the jury must decide." *Simon* v. *Solomon,* 385 Mass. 91, 105 (1982). See *Commonwealth* v. *LaCorte,* 373 Mass. 700, 705 (1977); *Commonwealth* v. *Montmeny,* 360 Mass. 526, 527-528 (1971); Proposed Mass. R. Evid. 704. Indeed, evidence at trial that a defendant's mind may have been impaired at the time of a crime, due either to a mental disease or to intoxication by drugs or alcohol, almost always includes expert testimony that relates to the ultimate issues of intent, knowledge, and the ability to premeditate by describing both the nature of a

---

[5]*Commonwealth* v. *Maltais,* 387 Mass. 79, 93 (1982), *Commonwealth* v. *Seit,* 373 Mass. 83, 91-92 (1977), *Commonwealth* v. *Fournier,* 372 Mass. 346, 349-350 (1977), and *Commonwealth* v. *Devlin,* 365 Mass. 149, 153-155 (1974), decisions cited by the Commonwealth in support of a trial judge's discretion to exclude expert testimony, are not relevant here. Those decisions address the scope of a trial judge's discretion to determine an expert's qualifications to testify on a particular subject. Here, the judge did not conclude that the expert was unqualified to render the opinion, and the Commonwealth did not contend at trial, and does not contend in its brief on appeal, that the expert lacked qualifications on the entire subject or an inappropriate basis in fact to render the opinion. Our conclusion that the opinion should have been permitted does not impinge on the discretion of trial judges to determine whether an individual is qualified to offer expert testimony in a particular area.

defendant's mental condition and its effect on his state of mind at the relevant time.[6] If the jury credited the defendant's evidence on intoxication, they would not have necessarily known, apart from the excluded expert testimony, what effect a blood alcohol level of .19 might have had on the defendant's mental processes. See *Simon* v. *Solomon, supra* at 105. We reject the Commonwealth's argument, based on *Commonwealth* v. *Blake*, 409 Mass. 146 (1991), that the judge's ruling should be sustained because the question asked of the expert was overbroad or confusing.[7]

2. The Commonwealth has indicated that, if a basis for relief is found pursuant to G. L. c. 278, § 33E, it would desire to reprosecute the defendant. We, therefore, conclude that the appropriate remedy is a new trial. The judge presiding at retrial may consider anew the qualifications of any expert offered as to the effects of intoxication. The judge should deny a request to instruct the jury that an individual with a blood alcohol level exceeding .10 per cent can be found to be intoxicated. We do not think the percentage of blood alcohol level that applies to motor vehicle cases should become the

---

[6]For example, in *Commonwealth* v. *Sama*, 411 Mass. 293, 295-296 (1991), the defendant's expert, a registered nurse specializing in the area of substance abuse, testified that, in her opinion, the defendant was a chronic alcoholic, that he was probably intoxicated from ingesting drugs and alcohol on the relevant date, and that he would most likely experience memory loss and might hallucinate as a result of ingesting intoxicating substances. In *Commonwealth* v. *Gurney, ante* 97, 100 (1992), a licensed clinical psychologist testified generally to the effect of alcohol ingestion on mental illness of the type suffered by the defendant. In *Commonwealth* v. *Brennan*, 399 Mass. 358, 359, 361 (1987), a psychiatrist specializing in alcoholism testified, that, due to intoxication, the defendant had lost his capacity to premeditate and was unable to make a decision in a normal manner.

[7]In *Blake*, a comparable question sought cumulative testimony because the witness there, a psychiatrist, already had "testified at length about the effects of drugs and alcohol on the mind and behavior." *Id.* at 159. The jury in this case heard no such testimony. The question concerned a core issue at the trial which the defendant's counsel pursued together with a weak claim that the defendant had not committed the crime. Certainly, the defendant's trial counsel might have done more to get the expert's evidence before the jury. However, as has been discussed, we treat the issue under G. L. c. 278, § 33E.

basis of an instruction in a first degree murder case on the effects of intoxication. The instructions that would apply here can be drawn from *Commonwealth* v. *Sires, supra,* and *Commonwealth* v. *Sama, supra.*

The judgment is reversed, and the verdict is set aside. The case is remanded for a new trial.

*So ordered.*