NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11659


COMMONWEALTH  vs.  EMMANUEL OKORO.



Plymouth.      September 3, 2014. - March 23, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


Homicide.  Constitutional Law, Sentence, Cruel and unusual
    punishment, Parole, Separation of powers.  Due Process of
    Law, Sentence, Parole.  Parole.  Witness, Expert.
    Evidence, Expert opinion.  Defense of Others.  Practice,
    Criminal, Sentence, Parole, Instructions to jury.



Indictment found and returned in the Superior Court
Department on February 29, 2008.

The case was tried before Paul E. Troy, J.; a motion for a
new trial, filed on January 7, 2011, was considered by him; a
motion for a new trial, a reduction in verdict, and
resentencing, filed on September 13, 2012, was heard by him; and
a motion for reconsideration was considered by him.

The Supreme Judicial Court granted an application for
direct appellate review.


Ruth Greenberg for the defendant.
Matthew Libby, Assistant District Attorney, for the
Commonwealth.
The following submitted briefs for amici curiae:
Jeanne M. Kepthorne for Markeese Mitchell.

Barbara Kaban, Committee for Public Counsel Services, for Youth Advocacy Division, Committee for Public Counsel Services, & others.
Laura M. Banwarth for Massachusetts Association of Criminal Defense Lawyers.
Richard L. Goldman for Terrance Pabon.

BOTSFORD, J.  The defendant, Emmanuel Okoro, appeals from his conviction of murder in the second degree.  He was fifteen years old at the time of the offense, January 1, 2008.  Pursuant to the sentencing statutes then in effect, the defendant received a mandatory sentence of life imprisonment with eligibility for parole after fifteen years.  The defendant argues that in light of the United States Supreme Court's decision in Miller v. Alabama, 132 S. Ct. 2455, 2460, 2469 (2012), and this court's decision in Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 658 (2013) (Diatchenko I), the defendant's mandatory life sentence constitutes a cruel and unusual punishment in violation of both the Eighth Amendment to the United States Constitution and art. 26 of the Massachusetts Declaration of Rights, and also violates constitutional guarantees of due process and separation of powers.  The defendant further argues that his conviction should be overturned because (1) the trial judge erroneously prevented him from introducing expert testimony and arguing that the way the brain develops in children and adolescents makes the condition of being a youth itself a mitigating factor to be

considered in determining whether the defendant was capable of forming the requisite mental state for murder; and (2) the judge erred in declining to instruct the jury on defense of another. For the reasons discussed below, we conclude that the defendant's sentence does meet the requirements of the Eighth Amendment and art. 26, as well as other constitutional rights, and we reject the defendant's challenges to his underlying conviction.

Background. 1. Facts. Although witnesses' accounts differed substantially and included contradictory testimony as to the exact events on the night of the killing, the jury could have found the following. On December 31, 2007, the defendant, aged fifteen, had been drinking and smoking marijuana with friends and family and was very drunk. Eventually, the defendant and his companions, including his sister, Iesha Strickland, attempted to go to a nearby New Year's Eve party, but they were turned away at the door by the victim, Markeen Starks, and another young man. The victim was known to the defendant and his sister, and had been involved in a series of violent incidents that appeared to constitute retaliation against Strickland after she had spoken to the police regarding an earlier killing.

At some point before midnight, the defendant and his companions left the site of the New Year's Eve party and went

home.  After the party ended, a crowd gathered outside the party site and a fight broke out.  The defendant and his companions saw this crowd and went toward it, and this time, the defendant was carrying a knife.  The defendant and the victim confronted one another, and although it is unclear who started the physical fight between them, the defendant stabbed the victim multiple times.[1]  The victim ultimately died from these wounds.

The defendant presented evidence at trial concerning the level of his cognitive functioning, as well as concerning his psychological profile and family background.  In particular, the defendant was tested shortly after the stabbing incident and found to have an intelligence quotient (IQ) score of 75 or 76, which placed him in the fifth percentile for youths his age in terms of cognitive functioning.  This level of cognitive functioning has been characterized as "borderline deficient," and is associated with difficulties in problem solving, flexible thinking, and detection of options.  In addition, psychological testing indicated that although the defendant was not severely mentally ill and was able to perceive reality accurately, he was vulnerable to "emotional disregulation," meaning that under stressful conditions he had a tendency toward simplified approaches to problem solving and being primarily influenced by

---

[1] We discuss these events in further detail infra, as they relate to the defendant's claim of error regarding the trial judge's decision not to instruct the jury on defense of another.

emotions.  The defendant also previously had been diagnosed with oppositional defiant disorder, which is typically associated with rule breaking and "profoundly annoying" behaviors, although not typically with violence.

A forensic psychologist who examined the defendant opined that much of the defendant's personality presentation could have been related to the combination of his cognitive limitations and his history of "exposure to chronic and severe domestic violence."  In particular, the defendant suffered abuse at the hands of his father for approximately two years, including punishments such as being forced to stand with his hands in the air for hours at a time or to kneel on hard, uncooked rice and salt.  At around age ten, the defendant was removed from his parents' home and placed in foster care, where he remained for three and one-half years.  During that time, he went through seven different foster homes due to behavioral problems, and he eventually went to live at a group residential home for youth. By the time the defendant was about thirteen years old, his father had been deported to Nigeria, and the defendant was allowed to return to live with his mother, but by then he was struggling with poor anger management, disruptive behavior, and alcohol abuse problems.  Although he was taking several types of prescribed medications to help with his behavior when he returned to his mother, his mother decided to "wean him off"

these medications, and instead allowed him to drink alcohol and smoke marijuana, because it kept him "more calm."

2. Procedural history. In February, 2008, the defendant was indicted on a charge of murder in the first degree, and he was tried in December, 2010. The jury found the defendant guilty of murder in the second degree,[2] and he was sentenced to life imprisonment with parole eligibility after fifteen years. See G. L. c. 265, § 2, as amended through St. 1982, c. 554, § 3; G. L. c. 127, § 133A, as amended through St. 2000, c. 159, § 230. See also G. L. c. 119, § 72B, inserted by St. 1996, c. 200, § 14. On January 7, 2011, the defendant moved for a new trial or, alternatively, for a reduction of the verdict to manslaughter pursuant to Mass. R. Crim. P. 25 (b) (2), as amended, 420 Mass. 1502 (1995). He also filed a notice of appeal from his conviction on January 13, 2011. The trial judge denied the defendant's motion without a hearing. Thereafter, the defendant's new appellate counsel filed on the defendant's behalf a renewed motion for a new trial and a request for resentencing.

In the renewed motion, the defendant argued that due to his young age, he should be entitled to individualized resentencing

---

[2] The judge had instructed the jury on the crimes of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty, murder in the second degree, and voluntary and involuntary manslaughter.

at which his age could be taken into account.  The trial judge denied the motion.  The defendant later requested reconsideration of the denial in light of this court's recent decisions in Diatchenko I, 466 Mass. 655, and Commonwealth v. Brown, 466 Mass. 676 (2013).  In denying the defendant's request, the trial judge stated that although he was "no[t] unsympathetic to the defendant's plight," "[a]ge, remorse and abusive upbringing and rehabilitation" were not grounds to allow the request under rule 25 (b) (2).

The defendant filed an appeal in the Appeals Court from the denials of his motion for a new trial and his request for reconsideration, which was consolidated with the pending appeal from his conviction.  This court granted the defendant's application for direct appellate review.[3]

Discussion.  1.  Constitutionality of the defendant's sentence.  a.  Eighth Amendment and art. 26.  At the time of the defendant's offense, every conviction of murder in the second degree, regardless of a defendant's age at the time the offense was committed, required a mandatory sentence of life

---

[3] We acknowledge the amicus briefs submitted in support of the defendant by the Youth Advocacy Division, Committee for Public Counsel Services; American Civil Liberties Union of Massachusetts; Campaign for the Fair Sentencing of Youth; Citizens for Juvenile Justice; End Mass Incarceration Together; and Hon. Gail Garinger (ret.); by the Massachusetts Association of Criminal Defense Lawyers; by Markeese Mitchell; and by Terrance Pabon.

imprisonment with eligibility for parole after fifteen years.[4]
The defendant argues that because he was a juvenile at the time
of the offense, this mandatory life sentence, despite his

---

[4] In particular, G. L. c. 265, § 2, as amended through St.
1982, c. 554, § 3, provided in relevant part:  "Whoever is
guilty of murder in the second degree shall be punished by
imprisonment in state prison for life. . . ."  General Laws
c. 127, § 133A, as amended by St. 2000, c. 159, § 230, provided
in part:  "Every prisoner who is serving a sentence for life . .
. shall be eligible for parole . . . [at] the expiration of
fifteen years of such sentence."  In addition, G. L. c. 119,
§ 72B, inserted by St. 1996, c. 200, § 14, provided:  "If a
person is found guilty of murder in the second degree committed
on or after his fourteenth birthday and before his seventeenth
birthday . . . , the superior court shall commit the person to
such punishment as is provided by law.  Said person shall be
eligible for parole under [G. L. c. 127, § 133A,] when such
person has served fifteen years of said confinement."

    The Legislature amended this punishment scheme in 2012,
such that a conviction of murder in the second degree for an
adult offender now carries a mandatory sentence of life
imprisonment with the sentencing judge to set the date of parole
eligibility to begin no earlier than after fifteen years and no
later than after twenty-five years.  G. L. c. 127, § 133A, as
amended through St. 2012, c. 192, §§ 37-39 (providing that
minimum parole term is now set according to G. L. c. 279, § 24);
G. L. c. 279, § 24, as amended through St. 2012, c. 192, § 46.
The statutes were amended again in 2014, but the mandatory life
sentence with parole eligibility after fifteen to twenty-five
years for murder in the second degree remains the same.  See
G. L. c. 265, § 2, as amended through St. 2014, c. 189, § 5;
G. L. c. 279, § 24, as amended through St. 2014, c. 189, § 6.
Of more direct relevance here, with respect to defendants
between fourteen and eighteen who are convicted of murder in the
second degree and are subject to sentencing under G. L. c. 119,
§ 72B, although § 72B was amended in 2013 and again in 2014, the
Legislature did not change the fifteen-year parole eligibility
date for this cohort.  See G. L. c. 119, § 72B, as amended by
St. 2013, c. 84, §§ 24, 24A; G. L. c. 119, § 72B, as amended by
St. 2014, c. 189, § 2.  The 2013 amendments expanded the class
of persons covered by § 72B to include seventeen year old
defendants.  St. 2013, c. 84, §§ 24, 24A.

eligibility for future parole, is unconstitutional.  Although the defendant grounds his claim in both the Eighth Amendment and art. 26, the thrust of his argument is essentially that the Eighth Amendment, as explicated in the United States Supreme Court's decision in Miller, 132 S. Ct. 2455, requires individualized sentencing by the "sentencer" -- the judge -- in every case in which a juvenile homicide offender[5] receives a life sentence.[6]

We agree with the defendant that certain language in Miller can be read to suggest that individualized sentencing is required whenever juvenile homicide offenders are facing a sentence of life in prison.  See Miller, 132 S. Ct. at 2467 ("mandatory penalties [such as life in prison without parole] preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to

---

[5] The term "juvenile homicide offender" refers in this opinion to a person who has been convicted of murder in the first or second degree and was under the age of eighteen at the time that he or she committed the murder.

[6] The defendant does not argue that even if the Eighth Amendment to the United States Constitution does not demand individualized sentencing by a judge in his case, art. 26 of the Massachusetts Declaration of Rights contains an independent requirement for an individualized, judicially determined sentence.

In addition to his argument about the constitutionality of his punishment, the defendant claims that the sentence violates his due process rights and also art. 30 of the Massachusetts Declaration of Rights.  We address these claims in part 1.b, infra.

it"); id. at 2468 ("in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult"). See also id. at 2466 n.6 ("Graham [v. Florida, 560 U.S. 48 (2010),] established one rule . . . for nonhomicide offenses, while we set out a different one [individualized sentencing] for homicide offenses"). However, Miller's actual holding was narrow and specifically tailored to the cases before the Court:  presented with two juvenile defendants convicted of murder in the first degree, the Court concluded that a mandatory sentence of life in prison without parole violated the Eighth Amendment. Miller, supra at 2469.[7]

This court has construed Miller and its consideration of individualized sentencing to be limited to the question whether a juvenile homicide offender can be subjected to a mandatory sentence of life in prison without parole eligibility. See Diatchenko I, 466 Mass. at 668 ("the Supreme Court said in Miller that on those occasions when a State seeks to impose life in prison without parole on a juvenile homicide offender, there

_____

[7] The Court stated:  "We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. Cf. Graham [v. Florida, 560 U.S. 48, 75 (2010)] ('A State is not required to guarantee eventual freedom,' but must provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation'). By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." Miller v. Alabama, 132 S. Ct. 2455, 2469 (2012).

must be an individualized hearing to evaluate the unique characteristics of the offender and assess whether this punishment is appropriate in the circumstances").  See also Brown, 466 Mass. at 686-688.  Accordingly, Diatchenko I and Brown, which both involved juvenile homicide offenders convicted of murder in the first degree, left in place the mandatory life sentence imposed by the murder sentencing statute, G. L. c. 265, § 2, but declared invalid, as applied to the two defendants and similarly situated juvenile homicide offenders, the portion of that statute that rendered persons convicted of murder in the first degree ineligible for parole.  The result for both defendants was a sentence of life imprisonment with parole eligibility after fifteen years.  See Diatchenko I, supra at 674; Brown, supra at 688-689 & n.10.

As this court's decision in Diatchenko I makes clear, we fully accept the critical tenet of Miller that "children are constitutionally different from adults for purposes of sentencing," Miller, 132 S. Ct. at 2464, with "diminished culpability and greater prospects for reform."  Id.  See Diatchenko I, 466 Mass. at 669-671.  See also id. at 675 (Lenk, J., concurring).  But as just stated, to date we have determined that a mandatory life sentence with the possibility of parole satisfies the constitutional requirements for juveniles convicted of murder in the first degree, on the understanding

that it will be for the parole board (board) to take into account "the unique characteristics" of such offenders that make them constitutionally distinct from adults, and to ensure that such offenders are afforded a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Diatchenko I, supra at 674, quoting Graham, 560 U.S. at 75. Nevertheless, as we indicated in Brown, we have left open for future consideration "the broader question whether discretion is constitutionally required in all instances of juvenile sentencing." Brown, 466 Mass. at 688.

In this case, in contrast to the offenders in Diatchenko I and Brown, the defendant has been convicted of murder in the second degree. Although this offense does not include acts of deliberate premeditation or extreme atrocity or cruelty, murder in the second degree is an intentional crime involving the killing of another person; the severity of the offense, even when committed by a juvenile offender, goes without saying. See Diatchenko I, 466 Mass. at 674. The Legislature has determined that every defendant convicted of murder in the second degree must serve a sentence of life in prison with the possibility of parole after fifteen years. See G. L. c. 265, § 2; G. L. c. 119, § 72B. While recognizing that "[art.] 26, like the Eighth Amendment, bars punishments which are unacceptable under contemporary moral standards" (citation and quotation omitted),

Libby v. Commissioner of Correction, 385 Mass. 421, 435 (1982), neither Miller nor Diatchenko I persuades us at the present time that such a mandatory sentence, imposed on a juvenile offender who commits murder in the second degree, violates the Eighth Amendment or art. 26.  For the reasons we next discuss, we continue to think it sensible to leave for a later day the question whether juvenile homicide offenders require individualized sentencing.

First, the defendant's argument that he is constitutionally entitled to an individualized, judicially determined, sentence is premised on Miller,[8] but as noted, Miller's requirement of individualized sentencing was limited to instances where a State seeks to impose life in prison without parole eligibility on a juvenile.  See Miller, 132 S. Ct. at 2474-2475.[9]  It is true that the defendant here was convicted of a less serious degree of murder than the juvenile defendants in Miller.  Nevertheless, even though Miller contains language suggesting that the requirement of individualized sentences for juveniles may extend

---

[8] As previously stated, the defendant does not suggest that even if Miller does not require individualized sentencing in his case under the Eighth Amendment, art. 26 does so.  See note 6, supra.

[9] Our decision in Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 671 (2013) (Diatchenko I), that art. 26 prohibits not only mandatory but judicially set discretionary sentences of life without parole for juvenile homicide offenders provides even broader protection for these offenders than Miller did.

beyond sentences of life without parole, we do not read Miller as a whole to indicate that the proportionality principle at the core of the Eighth Amendment[10] would bar a mandatory sentence of life with parole eligibility after fifteen years for a juvenile convicted of murder in the second degree.

Second, the Supreme Court's determination that youth are constitutionally different from adults for purposes of sentencing is of fairly recent origin. Miller was decided in 2012, and its reasoning principally builds on cases that were decided in the last ten years -- in particular, Roper v. Simmons, 543 U.S. 551 (2005), and Graham, 560 U.S. 48 (2010). See Miller, 132 S. Ct. at 2463-2469. Although in some areas, this court has recognized for many years that youth are constitutionally different from adults,[11] until Miller was decided, we did not embrace the view that a constitutional distinction exists between juveniles and adults in relation to sentencing. See Diatchenko I, 466 Mass. at 659-661, 664, 667.[12]

---

[10] See Miller, 132 S. Ct. at 2463, citing Graham, 560 U.S. at 59.

[11] See Commonwealth v. A Juvenile (No. 1), 389 Mass. 128, 134 (1983) (knowing and intelligent waiver of Miranda rights by juvenile generally requires presence of parent or interested adult who understands Miranda warnings and can explain them to juvenile; for juveniles younger than fourteen years of age, no waiver is effective without this protection).

[12] Compare this court's decision in Diatchenko's direct appeal from his conviction, Commonwealth v. Diatchenko, 387

It is significant that judicial recognition of this principle is so recent.  As noted in Diatchenko I, the determination that youth are constitutionally distinct from adults for sentencing purposes has strong roots in recent developments in the fields of science and social science.[13] Scientific and social science research on adolescent brain development and related issues continues.[14]  At this point, we

_____

Mass. 718 (1982), where we rejected the substance of the argument that youth are constitutionally different from adults for sentencing purposes.  See id. at 721-722, 725.

[13] As discussed in Miller and Diatchenko I, research in this area thus far has been important in confirming what "any parent knows" about adolescents -- that many who exhibit "transient rashness, proclivity for risk, and inability to assess consequences" will grow out of these traits, because the adolescent brain, particularly in areas related to behavior control, is still developing.  Miller, 132 S. Ct. at 2464-2465 & n.5.  See Diatchenko I, 466 Mass. at 669-670 & n.14.  These observations were particularly important to our conclusion in Diatchenko I that juvenile homicide offenders can never be sentenced to life in prison without parole, because such a sentence requires a determination that the offender is "irretrievably depraved," a finding that is at odds with the fact that "the brain of a juvenile is not fully developed, either structurally or functionally."  Id. at 670.

[14] For example, researchers continue to study the age range at which most individuals reach adult neurobiological maturity, with evidence that although some brain systems have fully matured in most individuals by around age fifteen, other brain functions are not likely to be fully matured until around age twenty-two.  See Steinberg, Should the Science of Adolescent Brain Development Inform Public Policy? 50 Ct. Rev. 70, 74 (2014), reprinted from 28[3] Issues in Sci. & Tech. 67 (2012). Studies are also continuing into the various ways that environmental factors, such as chronic or extreme stress, trauma, or neglect can impact brain development and adolescent behavior.  See id. at 76; L. Steinberg, Age of Opportunity:

cannot predict what the ultimate results of this research will be, or more importantly, how it will inform our understanding of constitutional sentencing as applied to youth.  In short, we appear to deal here with a rapidly changing field of study and knowledge, and there is value in awaiting further developments.

Moreover, as is true of the science, the law relating to juveniles and sentencing continues to change and develop at this time.  State courts have disagreed as to whether Miller's holding applies retroactively,[15] and the Supreme Court has indicated that it may again take up the issue of juvenile sentencing in order to resolve this discrepancy.[16]  Although

---

Lessons from the New Science of Adolescence 22-23, 165-167 (2014); Environmental Influence on the Developing Brain:  A Report from the Fifth Annual Aspen Brain Forum, The Dana Foundation, Nov. 26, 2014, available at http://dana.org/News/ Environmental_Influence_on_the_Developing_Brain [http://perma.cc/VJ8B-757P]; Inside Neuroscience:  Scientists Examine How Brain Structure and Function Change During Adolescence, Society For Neuroscience, Sept. 18, 2013, available at http://www.sfn.org/news-and-calendar/news-and-calendar/news/middle-spotlight/inside-neuroscience-changes-during-adolescence [http://perma.cc/Z9P3-5R2U].  New knowledge in these areas may have important implications for law and social policy decisions, including decisions that affect juvenile sentencing.

[15] Compare, e.g., Diatchenko I, 466 Mass. at 666, and State v. Mantich, 287 Neb. 320, 342, cert. denied 135 S. Ct. 67 (2014), with State v. Tate, 130 So. 3d 829, 831 (La.), cert. denied, 134 S. Ct. 2663 (2014), and People v. Carp, 496 Mich. 440, 451 (2014).

[16] The Supreme Court had recently granted certiorari in a case that concerned the retroactivity of Miller.  See Toca v. Louisiana, 135 S. Ct. 781 (mem.) (2014).  However, prior to oral

there does not appear to be any case currently before the Court concerning this issue, the Toca case (see note 16, supra) indicates a reasonable possibility that the Court may shed additional light on Miller's full implications and on the constitutional requirements for juvenile sentencing generally before too long.  Meanwhile, some States, either judicially or legislatively, have provided additional sentencing protections for juveniles beyond the minimum requirements articulated in Miller.[17]  Although the rights guaranteed under art. 26 may be broader than those guaranteed under the Eighth Amendment, art. 26 nevertheless "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society," such that developments in the area of juvenile justice in judicial

---

argument in that case, the petitioner's murder conviction was vacated, resulting in his release, and the Court dismissed the certiorari petition.

[17] See State v. Lyle, 854 N.W.2d 378, 400 (Iowa 2014) (holding unconstitutional under Iowa Constitution all mandatory minimum prison sentences for youthful offenders).  See also Del. Code Ann. tit. 11, §§ 636, 4204A, 4209, 4209A (permitting sentences of from twenty-five years to life in prison without parole for juveniles convicted of murder in first degree in Delaware, and permitting such offenders to petition for sentence modification after having served thirty years of their original sentences and every five years thereafter); W. Va. Code § 61-11-23 (effective June 6, 2014) (eliminating life sentences without parole for West Virginia offenders who were under age of eighteen at time of crime, identifying mitigating circumstances that must be taken into consideration when sentencing juvenile offenders, and requiring parole board to take into consideration diminished culpability of youth during parole hearings for juvenile offenders).

opinions and legislative actions at the State, Federal, and international levels help to inform our understanding of what art. 26 protects (citation omitted). See Michaud v. Sheriff of Essex County, 390 Mass. 523, 533-534 (1983). Given the unsettled nature of the law in this area and the indication that it is still evolving, we think it prudent to allow this process to continue before we decide whether to revisit our interpretation of Miller and the scope of its holding.

Finally, although both juvenile and adult homicide offenders remain subject to a mandatory life sentence, it is important to note that there are a number of ways that the constitutional differences between juvenile and adult homicide offenders currently are reflected in our sentencing laws. Thus, while the mandatory punishment for murder in the first degree for an adult remains life in prison without parole, a juvenile convicted of this crime is now guaranteed to become eligible for parole at some point in his or her life. See Diatchenko I, 466 Mass. at 671. See also G. L. c. 265, § 2, as amended through St. 2014, c. 189, § 5; G. L. c. 279, § 24, as amended through St. 2014, c. 189, § 6. For murder in the second degree, adult offenders may be imprisoned for up to twenty-five years before they become eligible for parole, but juvenile offenders must become eligible for parole after fifteen years. See G. L. c. 279, § 24, as amended through St. 2014, c. 189, § 6; G. L.

c. 119, § 72B, as amended through St. 2014, c. 189, § 2.  In addition, the Legislature has ensured that youthful offenders[18] who are incarcerated are not restricted in their ability to take part in educational and treatment programs, or to be placed in a minimum security facility, solely because of the nature of their criminal convictions or the length of their sentences; these are protections not afforded to adult offenders.  G. L. c. 119, § 72B, as amended by St. 2014, c. 189, § 2.  And finally, as discussed infra, juvenile homicide offenders, including those convicted of murder in the second degree, at their parole hearings will have access to due process rights.

In sum, we conclude that at present, a mandatory life sentence with parole eligibility after fifteen years for a juvenile homicide offender convicted of murder in the second degree does not offend the Eighth Amendment or art. 26.

b.  Due process and art. 30.  The defendant advances two other constitutional arguments in favor of individualized sentencing.  First, he asserts that the parole process lacks significant due process protections such as access to counsel, and includes no guarantees that the board will take into

---

[18] The statute defines this term as including, inter alia, individuals who have been convicted of crimes committed when they were between the ages of fourteen and eighteen, if such crimes are punishable by imprisonment in the State prison and involve the threat or infliction of serious bodily harm.  G. L. c. 119, § 52.

consideration any of the attributes of youth identified in Miller as relevant to the issue of sentencing.  See Miller, 132 S. Ct. at 2468.  Recognizing these issues and how fundamental they are to ensuring that parole eligibility provides a "meaningful opportunity to obtain release" for juveniles sentenced to life in prison, see Diatchenko I, 466 Mass. at 674 (citation omitted), we have today concluded, in Diatchenko v. District Attorney for the Suffolk Dist., ante    ,     (2015) (Diatchenko II), that certain due process protections not available to adult offenders in their parole hearings must be made available to juvenile offenders convicted of murder in the first degree.  For the reasons discussed in that case, we conclude here that the same procedural protections in the parole process must be provided to juveniles convicted of murder in the second degree.

Finally, the defendant argues that a mandatory sentence of life in prison with eligibility for parole for juvenile homicide offenders impermissibly vests in the executive branch of government the power to determine whether juveniles serve their entire lives in prison, in violation of art. 30's requirement of separation of powers.  It is true that the grant or denial of parole is a discretionary act of the board and therefore an executive -- not judicial -- function.  See Commonwealth v. Cole, 468 Mass. 294, 302 (2014).  However, as discussed, we have

thus far concluded that, following Miller, the Eighth Amendment does not require individualized, discretionary judicial sentencing of juvenile homicide offenders before these offenders may be sentenced to life in prison with eligibility for parole.[19] Accordingly, the fact that the executive branch, through the board, is charged with making parole decisions for juvenile homicide offenders does not violate the principle of separation of powers, because neither the Eighth Amendment nor art. 26 requires parole decisions to be vested in the judicial branch.[20]

It remains for us to address the defendant's claims that the trial judge erred in two ways:  by prohibiting the

---

[19] As stated previously, the defendant appears to restrict his argument about individualized sentencing to the Eighth Amendment, and does not involve art. 26.  It is clear from the court's decisions in Diatchenko I, 466 Mass. 655, and Commonwealth v. Brown, 466 Mass. 676 (2013), however, that we have not concluded that art. 26 requires this result.

[20] The defendant raises two additional arguments, one based on this court's decision in Commonwealth v. Walczak, 463 Mass. 808 (2012), and the other on the court's power under G. L. c. 278, § 33E, as to why he should have the opportunity to argue before a court for a sentence to a term of years less than life. However, Walczak concerned the requirements that apply before a juvenile may be indicted by a grand jury for the crime of murder when there is evidence of mitigating circumstances, see Walczak, supra at 810, and G. L. c. 278, § 33E, applies uniquely to review of all convictions of murder in the first degree, whether of adult or juvenile offenders.  Thus, neither of these claims relates to the constitutional requirements for sentencing juvenile homicide offenders, the fundamental issue here. Accordingly, we see no reason to exercise this court's power of superintendence over the courts in order to create an opportunity for the defendant to argue for a lesser sentence on either of these bases.

defendant's expert witness from testifying as to how youth may limit a defendant's ability to formulate malice, and by refusing to provide a jury instruction on defense of another. Neither of these claims is persuasive. We address the expert testimony issue first.

2. Expert testimony regarding defendant's age. Prior to trial, the defendant notified the court and the Commonwealth that Dr. Robert Kinscherff, a psychologist who serves as the director of forensic studies at the Massachusetts School of Professional Psychology, was expected to testify on the defendant's behalf regarding the "effect of the defendant's age and his life experience on his actions in the alleged incident." The Commonwealth sought to exclude this testimony on the ground that an expert is not permitted to render an opinion that a juvenile is unable to form the specific intent required for a murder conviction.

The trial judge held a hearing on the issue and concluded that although an expert witness could not base an opinion on adolescent brain development generally and conclude from it that a fifteen year old by definition (i.e., always) is unable to form the specific intent required for murder, Kinscherff would be allowed to testify as to this particular defendant's "mental impairment or condition on the night in question." The issue was then revisited at length in a sidebar discussion between

counsel and the judge during Kinscherff's trial testimony.  The defendant's trial counsel assured the judge at that time that any testimony of Kinscherff regarding the neurological development of a teenager's brain would be tied directly to this defendant's capacity for impulse control, his response to threats, and his ability to make decisions, and would relate to the defendant's intent only in this way.  The judge then permitted the expert to testify at length regarding the biological aspects of teenage brain development and how these aspects may be related to adolescent behavior generally and to the defendant's behavior specifically.[21]

Despite the significant testimony that Kinscherff presented regarding teenage brain development and the defendant's

---

[21] For example, Dr. Robert Kinscherff described some of the current science regarding child and adolescent brain development and then connected this information to research findings that people who may have been more impulsive during their teenage years "tend over time to become less impulsive, more capable of making considered judgments, more capable of reflecting on options that they have and plausible consequences to the decisions that they make."  He also testified that "[a]dolescents are more stress responsive than most adults." With regard to the defendant specifically, Kinscherff opined that even as compared to other adolescents generally, the defendant appeared to be more vulnerable in areas such as emotional regulation, impulse control, and balanced decision-making.  He also had more difficulty controlling his temper. His ability to process threats and control his behavior were likely further affected by his cognitive disabilities, which may have caused him to see the world in a "fairly simplistic way"; his history of exposure to violence and resulting hypervigilance; his violent social environment; and his intoxication on the night of the incident.

individual mental capacity, on appeal the defendant argues that he was nevertheless denied the right to present a full defense because Kinscherff was not permitted to testify as to how the incomplete developmental maturity of the adolescent brain relates to the ability of a teenager to form the required intent for malice. For its part, the Commonwealth asserts that as a matter of law, youth generally, including those who are fifteen, have been determined to have the capacity to form the intent required for murder in the first or second degree, and that Kinscherff was precluded only from giving expert testimony that would have touched on this legislatively resolved issue.[22] We conclude there was no error.

This court previously has acknowledged that, although children may have not have the maturity fully to appreciate the consequences of wrongful actions, "that does not mean that a delinquent child lacks the ability to formulate the specific intent to commit particular wrongful acts." Commonwealth v. Ogden O., 448 Mass. 798, 804 (2007). Where the Legislature has determined that a youth is capable of committing certain crimes, we have noted that "respect for the legislative process means that it is not the province of the court to sit and weigh

---

[22] The Commonwealth also notes that the defendant did not actually seek to have Kinscherff testify during the trial regarding the general inability of a teenager to form the intent for malice. The procedural history on this point is not fully clear. We choose to address the defendant's claim.

conflicting evidence supporting or opposing a legislative enactment." Id. at 805 n.6, quoting Massachusetts Fed'n of Teachers, AFT, AFL-CIO v. Board of Educ., 436 Mass. 763, 772 (2002). Here, the Legislature has enacted G. L. c. 119, § 72B, which, as it applied to the defendant, directs the Superior Court to punish individuals who are found to have committed murder in the first or second degree on or after their fourteenth birthday and before their eighteenth birthday "as is provided by law." Thus, the Legislature has clearly indicated that youth in the defendant's age group are considered capable of committing murder, and the trial judge was correct to preclude the defendant from putting forward evidence that would have suggested it was impossible for anyone the defendant's age to formulate the necessary intent to commit this crime.

However, we also have noted that "[e]xpert testimony 'is admissible whenever it will aid the jury in reaching a decision, even if the expert's opinion touches on the ultimate issues that the jury must decide.'" Commonwealth v. Federico, 425 Mass. 844, 847 (1997), quoting Commonwealth v. Dockham, 405 Mass. 618, 628 (1989). Thus, we have long held that expert opinion evidence pertaining to a defendant's intoxication or mental impairment is appropriate for a jury to consider when a defendant is charged with a crime requiring specific intent. See Commonwealth v. Cruz, 413 Mass. 686, 690-691 (1992)

(defendant charged with and convicted of murder in first degree; expert testimony concerning effects of defendant's blood alcohol level at time of alleged offense should not have been excluded). Cf. Commonwealth v. Grey, 399 Mass. 469, 469-470, 473-474 (1987) (defendant charged with murder in first degree and convicted of murder in second degree; error for judge not to instruct on manslaughter in light of expert testimony regarding defendant's cognitive impairment and its effect on his capacity to form specific intent necessary for malice); Commonwealth v. Gould, 380 Mass. 672, 680-686 (1980) (defendant charged with and convicted of murder in first degree; error for judge not to instruct jury that they could consider expert testimony regarding defendant's psychiatric illness on issue of defendant's ability to act with deliberate premeditation or extreme atrocity or cruelty). This evidence is admissible because a defendant charged with a specific intent crime may have been so impaired by intoxication or mental illness that a jury could find him or her incapable of having had the level of intent necessary to commit the crime at the time of the incident. See, e.g., Cruz, supra at 689-690.

In light of these principles, the trial judge was correct in allowing Kinscherff to testify regarding the development of adolescent brains and how this could inform an understanding of this particular juvenile's capacity for impulse control and

reasoned decision-making on the night of the victim's death. This information was beyond the jury's common knowledge, it offered assistance to the jury in determining whether the defendant was able to form the intent required for deliberate premeditation or malice generally at the time of the incident, and it did not amount to an opinion that the defendant (or any other fifteen year old) was incapable of forming the intent required for murder in the first or second degree simply by virtue of being fifteen. In this way, Kinscherff's permitted testimony aided the jury in reaching a decision by helping them to understand "both the nature of [the] defendant's mental condition and its effect on his state of mind at the relevant time." Cruz, 413 Mass. at 690-691.[23,24]

---

[23] In drawing the analogy between Kinscherff's opinion testimony here and cases in which expert evidence is presented relating to the impact of alcohol consumption or mental illness on the defendant's ability to form the intent necessary for the crime, we do not suggest, as the defendant argues, that youth itself "is a disorder." Rather, a defendant's young age can be a factor in evaluating the defendant's mental state or in determining whether the defendant's capacity for self-control may have been affected at the time of the incident. However, the mere fact that the defendant was fifteen years old when the events occurred cannot be the basis in and of itself for a finding that the defendant lacked the necessary mental state to commit the crime.

[24] During oral argument the Commonwealth asserted that Kinscherff's trial testimony went too far into a discussion of adolescent brain development research and the scientific bases for impulsivity and other common traits of teenagers, and that this testimony impermissibly intruded upon the jurors' ability to use their common knowledge of teenage behavior in order to

3.  Defense of another.  Finally, the defendant argues that the trial judge committed reversible error in declining to instruct the jury that the defendant's actions may have been excused, or that he may have been guilty only of manslaughter, rather than murder, because he was acting in defense of another when he stabbed the victim.  The defendant requested such an instruction, and objected when it was not given.[25]  The prejudicial error standard therefore applies on appeal, see Commonwealth v. Burgos, 462 Mass. 53, 66-67, cert. denied, 133 S. Ct. 796 (2012), but there was no error.

An actor (defendant) may use force against another in order to protect a third person when "(a) a reasonable person in the [defendant's] position would believe his intervention to be necessary for the protection of the third person, and (b) in the circumstances as that reasonable person would believe them to

_____

form an opinion about this defendant's mental state at the time of the incident.  However, just as increasingly sophisticated scientific knowledge of adolescent brain functioning has assisted in informing our understanding of what punishments may constitutionally be imposed on juvenile offenders, so, too, do we believe that this scientific knowledge could assist a jury to form an opinion as to a defendant's mental state at the time of his alleged crime.  See Diatchenko I, 466 Mass. at 667-668, 669-670.

[25] The Commonwealth argues that defense counsel's objection to the lack of instruction on defense of another was untimely.  However, as the Commonwealth acknowledges, the trial judge accepted defense counsel's objection, even though it was late.  In addition, the judge noted on the record that defense counsel had clearly indicated during the charge conference that he was seeking an instruction on defense of another.

be, the third person would be justified in using such force to protect himself." Commonwealth v. Young, 461 Mass. 198, 208 (2012), quoting Commonwealth v. Martin, 369 Mass. 640, 649 (1976). It is not necessary for the jury to find that the third person in fact would have been entitled to use force in self-defense at the time of the incident in order for the defendant to invoke this defense; however, the intervening defendant must have had a reasonable belief that the third person was being unlawfully attacked. Young, supra at 209. "The reasonableness of the belief may depend in part on the relationships among the persons involved," but if the defendant uses deadly force in order to protect another where that amount of force was unwarranted, the defendant's conduct will not be fully excused and he or she may still be found guilty of manslaughter. Martin, supra at 649. See Commonwealth v. Johnson, 412 Mass. 368, 372 (1992). A judge must instruct the jury on defense of another where the evidence when viewed in the light most favorable to the defendant could support a finding that the use of force was justified on this basis. See, e.g., Commonwealth v. McClendon, 39 Mass. App. Ct. 122, 125 (1995).

The defendant argues that he was entitled to a jury instruction on defense of another on the theory that he was defending his older sister, Strickland, when the offense was committed. There was evidence presented at trial that the

victim and the victim's friend, Elijah Finch, had been involved in acts of violence directed toward Strickland for some time before the victim's death.  Specifically, the jury could have found the following.  Up until the summer of 2007, the defendant and the victim were friendly with one another, but in July, 2007, Strickland attended a party where she saw Finch waving a gun in the air, shots were then fired, and a man fell to the ground.  After Strickland spoke to the police about the incident, she developed a reputation for having implicated Finch in the shooting, and she experienced retaliation:  her friends were physically beaten on two separate occasions, and shots were fired at the house where the defendant and Strickland both lived several weeks later.  The victim was present when all three of these incidents occurred, and he verbally encouraged at least one of the beatings.  The defendant had been home when the shots were fired, and he could have been aware of the other incidents as well due to his relationship with Strickland.  Thus, the jury could have found that Strickland had a legitimate fear of the victim and Finch, and that the defendant was aware of this fear.

Turning to December 31, 2007, the night of the killing, the jury could have found that Strickland was standing near the defendant at the moment that the defendant and the victim began to fight, that the victim was armed with a knife at some point that night, and that Finch or another friend of the victim's was

armed with a gun.  Considering this evidence in the light most favorable to the defendant, the jury could have reasonably concluded that the defendant was concerned for his sister's safety that evening, and that there was a general atmosphere of animosity and fear present.  However, despite this atmosphere of animosity and the presence of the victim, Finch, and Strickland, there was no evidence presented that suggested the victim or Finch directed any immediate, physical threat toward Strickland that night during or prior to the fight between the defendant and the victim.  None of the witnesses, including those favorable to the defendant, testified that the victim or anyone else appeared to be on the verge of striking or otherwise harming Strickland at the moment that the defendant and the victim began fighting.  Strickland herself testified for the defense that as she and the defendant were walking toward the location where the defendant and the victim ultimately fought, Strickland paused to tie her sneaker; while doing so, she heard someone yell out a warning to the defendant; she then ran through a crowd of people to where her brother was already engaged in the fight with the victim; and she stood there watching the fight.  She also stated that the gun did not appear at the scene until after the victim and the defendant had begun to fight,[26] and that she herself pushed the defendant out of the

---

[26] Although witness accounts differed as to from where Finch

way of the gun.[27]  In these circumstances, even when considered in the light most favorable to the defendant, the evidence does not support a finding that a reasonable person in the defendant's position at the time of the fight with the victim would have felt it necessary to defend his sister against the victim, much less to do so using violent force.  See Martin, 369 Mass at 649; McClendon, 39 Mass. App. Ct. at 125.

In sum, we agree with the trial judge that a jury instruction on defense of another was not warranted on the evidence presented at trial.

Judgment affirmed.

Orders denying motions for new trial, for reduction of verdict, for resentencing, and for reconsideration affirmed.

---

had come -- assuming it was Finch who had the gun, which was uncertain -- and when Finch had arrived at the scene of the fight, the testimony of the various witnesses who mentioned the gun generally accorded with Iesha Strickland's account that the gun appeared after the victim and the defendant had begun to fight.

[27] These aspects of Strickland's testimony did not change substantially on cross-examination.

SPINA, J. (concurring in part and dissenting in part, with whom Cordy, J., joins). I agree with the opinion of the court except for part 1.b, "Due process and art. 30," <u>ante</u> at    . As to that section, I dissent for the reasons stated in my dissent in <u>Diatchenko</u> v. <u>District Attorney for the Suffolk Dist</u>., <u>ante</u> ,    (2015).