NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12053

TIMOTHY DEAL & others[1] vs.  COMMISSIONER OF CORRECTION
& another.[2]


Suffolk.     May 3, 2016. - August 25, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.[3]


Commissioner of Correction.  Constitutional Law, Sentence,
Parole.  Due Process of Law, Sentence, Parole, Prison
classification proceedings.  Imprisonment, Reclassification
of prisoner.  Parole.  Youthful Offender Act.  Practice,
Criminal, Sentence, Parole.


Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on July 14, 2015.

The case was reported by Botsford, J.


Barbara Kaban (Benjamin H. Keehn, Committee for Public
Counsel Services, & James W. Rosseel with her) for the
petitioners.
Charles Anderson, Jr., for the respondents.

---

[1] Siegfried Golston and Jeffrey Roberio.

[2] Assistant Deputy Commissioner of Correction.

[3] Justice Cordy participated in the deliberation on this
case and authored this opinion prior to his retirement.
Justices Spina and Duffly participated in the deliberation on
this case prior to their retirements.

David J. Apfel & Eileen L. Morrison, for American Civil Liberties Union of Massachusetts & others, amici curiae, submitted a brief.


CORDY, J.  This case is before us on the reservation and report of the single justice.  The petitioners, Timothy Deal, Siegfried Golston, and Jeffrey Roberio, are juvenile homicide offenders[4] who are serving mandatory indeterminate life sentences and who have a constitutional right to a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."  Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 674 (2013) (Diatchenko I), quoting Graham v. Florida, 560 U.S. 48, 75 (2010).  This right also extends to juveniles convicted of murder in the second degree.  See Diatchenko v. District Attorney for the Suffolk Dist., 471 Mass. 12, 32 (2015) (Diatchenko II).  This case concerns the manner in which juvenile homicide offenders are classified and placed in Department of Correction (department) facilities.

The issue before us is whether the department's practice of using "discretionary override codes" to block qualifying

---

[4] In an earlier decision, we used the term "juvenile homicide offender" to refer to a person who has been convicted of murder in the first degree and was under the age of eighteen at the time that he or she committed the murder.  See Diatchenko v. District Attorney for the Suffolk Dist., 471 Mass. 12, 13 n.3 (2015).  In this case, we use the term to refer to individuals who have been convicted of either murder in the first degree or murder in the second degree and were under the age of eighteen at the time of the offense.

juvenile homicide offenders from placement in a minimum security facility unless and until the individual has received a positive parole vote violates (1) G. L. c. 119, § 72B, as amended by St. 2014, c. 189, § 2; or (2) their right to a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation under the Eighth and Fourteenth Amendments to the United States Constitution, arts. 12 and 26 of the Massachusetts Declaration of Rights, or both Constitutions.

We conclude that the department's current classification practice violates G. L. c. 119, § 72B, as amended by St. 2014, c. 189, § 2, because the department's failure to consider a juvenile homicide offender's suitability for minimum security classification on a case-by-case basis amounts to a categorical bar as proscribed by the statute. We further conclude that the department's practice does not violate the petitioners' constitutional right to a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation because there is no constitutionally protected expectation that a juvenile homicide offender will be released to the community after serving a statutorily prescribed portion of his sentence.[5]

---

[5] We acknowledge the amicus brief submitted by the American Civil Liberties Union of Massachusetts; Boston College Juvenile Rights Advocacy Project; Campaign for Fair Sentencing of Youth; Charles Hamilton Houston Institute, Harvard Law School; Citizens for Juvenile Justice; Coalition for Effective Public Safety; Communities for People; Harvard Prison Legal Assistance Project;

Background.  1.  Department classification process.  In 2002, the National Institute of Corrections provided technical assistance to the department to "revise and validate the classification instrument for both males and females."  The final product, entitled "Objective Point Base Classification-Reclassification Form" (objective classification form), consists of "objectively defined criteria" that are "weighed, scored, and organized into a valid and reliable classification instrument accompanied by an operational manual for applying the instrument to inmates in a systematic manner."  103 Code Mass. Regs. § 420.06 (2007).

On commitment, and annually thereafter, the department determines the appropriate security placement level for each prisoner through the classification process, called the "Internal Classification Status Review."  103 Code Mass. Regs. §§ 420.08, 420.09 (2007).  The twin goals of the process are to promote "public safety" and "the responsible reintegration of offenders."  103 Code Mass. Regs. § 420.07 (2007).  To achieve these goals, the process "objectively assess[es] the inmate's custody requirements and programmatic needs and match[es] those to the appropriate security level in a manner that minimizes the

Justice Resource Institute; Massachusetts Association of Criminal Defense Lawyers; Northeastern Prisoners' Assistance Project; Prisoners' Legal Services of Massachusetts; Roca, Inc.; Roxbury Youthworks, Inc.; Span, Inc.; Dr. Frank DiCataldo; Dr. Robert Kinscherff; and Francine Sherman, Esq.

potential for escape, prison violence and inmate misconduct," by, inter alia, "[r]ationally using a reliable, validated set of variables to support classification decisions."  103 Code Mass. Regs. § 420.07(a).  Based on the outcome of the classification process, a prisoner is assigned to a maximum, medium, or minimum security facility.

The classification process proceeds in several steps. First, a correctional program officer (CPO) is responsible for gathering the information required to score each variable contained in the prisoner's objective classification form.  103 Code Mass. Regs. § 420.09.[6]  The CPO computes the total score and compares it to a set of cut-off values to determine the

---

[6] The variables and their scoring ranges are:

1. severity of current offense (possible score 1-6);

2. severity of convictions within the last four years (possible score 0-6);

3. history of escapes or attempts to escape (possible score 0-7);

4. history of prior institutional violence within the last four years (possible score 0-5);

5. number of guilty disciplinary reports within the last twelve months (possible score 0-4);

6. most severe guilty disciplinary report within the last eighteen months (possible score 0-7);

7. age (possible scores -2, 0, 1); and

8. program participation or work assignment (possible scores -2, -1, 0).

prisoner's preliminary custody level. Twelve or more points qualify a prisoner for maximum security; seven to eleven points qualify the prisoner for medium security; and six or fewer points qualify the prisoner for minimum security.

After calculating the prisoner's objective score, the CPO reviews the "non-discretionary" restrictions to determine if any apply. If the prisoner is not subject to a nondiscretionary restriction, the CPO then reviews the "discretionary overrides" to determine if any apply. The CPO also schedules an interview with the prisoner to discuss "matters related to classification and custody status." 103 Code Mass. Regs. § 420.09(1)(f).

Following the review process, the CPO makes recommendations and enters the results of the review into the department's computerized inmate information system. 103 Code Mass. Regs. § 420.09(2), (3). The institution's director of classification will review and then approve, modify, or deny the recommendations made by the CPO. 103 Code Mass. Regs. § 420.09(2). Prisoners who disagree with the internal classification status review results may appeal to the superintendent. 103 Code Mass. Regs. § 420.09(3).

If a review of the inmate's objective classification form and other factors set forth in the regulations indicate a need for a change in placement to a higher or lower security level, a hearing is conducted by a three-person classification board

consisting of institutional employees deemed qualified to make custody level determinations. 103 Code Mass. Regs. §§ 420.08(3)(a), 420.09(4). The prisoner appears before and participates in the hearing with the classification board, which reviews the prisoner's objective point base classification score and any cited restrictions or overrides. 103 Code Mass. Regs. § 420.08(3)(e)-(f). The classification board members then vote, with the board's final recommendation reflecting the majority vote of the three-person panel, and the prisoner is notified of the decision both orally at the time of the hearing and subsequently in writing. 103 Code Mass. Regs. § 420.08(3)(f). Prisoners may appeal the classification board's placement decision to the Commissioner of Correction (commissioner) or her designee. 103 Code Mass. Regs. § 420.08(3)(h).

State law provides that the purpose of classification boards is to make recommendations for inmate classification. G. L. c. 127, § 20A. Accordingly, the classification board's decision is a "final recommendation to the [c]ommissioner," 103 Code Mass. Regs. § 420.08(3)(f), subject to approval or rejection by the commissioner or her designee, who "shall utilize the scored custody level and any applicable restrictions or overrides to render a final placement decision." 103 Code Mass. Regs. § 420.08(3)(i). The assistant deputy commissioner of classification (assistant deputy commissioner) is one of

several department employees authorized by the commissioner to act as her designee, and rendered classification decisions in each of the petitioners' cases.

The department's classification system includes seven discretionary override codes (P through V), any one of which may be the basis for the commissioner or her designee to reject a classification board's final recommendation. The definitional section of the department's classification regulations, 103 Code Mass. Regs. § 420.06, defines "[d]iscretionary [o]verride" as "[a]n override of a scored custody level, based on the professional judgment of trained classification staff. Discretionary [o]verrides should account for [five to fifteen per cent] of all custody level decisions and are detailed in the Objective Classification Operational Manual." According to the department, the final decision of the commissioner or her designee balances the classification board's recommendation against the interests of the public, the department, and the inmate. The decision of the commissioner or her designee is final and cannot be appealed. 103 Code Mass. Regs. § 420.08(3)(i).

2. 2014 amendment and department response. In 2013, this court held that art. 26 of the Massachusetts Declaration of Rights prohibits the imposition of a life sentence without possibility of parole on a person younger than the age of

eighteen at the time of offense.  Diatchenko I, 466 Mass. at 658-659.  On July 25, 2014, the Legislature amended G. L. c. 119, § 72B, the statute which provides the penalties for juveniles convicted of murder, by inserting the following text at the end of the statute:

> "The department of correction shall not limit access to programming and treatment including, but not limited to, education, substance abuse, anger management and vocational training for youthful offenders, as defined in [G. L. c. 119, § 52], solely because of their crimes or the duration of their incarcerations. If the youthful offender qualifies for placement in a minimum security correctional facility based on objective measures determined by the department, the placement shall not be categorically barred based on a life sentence."

St. 2014, c. 189, § 2.

At the time the statute was amended, the department had a categorical bar which specifically prevented persons serving life sentences -- whether juveniles or adults at the time of offense -- from being housed in minimum security.  This categorical bar, "Non-Discretionary Minimum Custody Code E" (code E), stated the following:  "Non-Discretionary Minimum Custody Restriction Code E:  1st Degree Lifer -- 1st Degree lifers are not to be considered for minimum or below."  Code E's prohibitive sweep extended to all inmates serving a life sentence for murder in the first degree (designated by the department as "1st Degree lifers" [lifers]), and did not

discriminate based on the inmate's age at the time of the offense.

Also at the time the amended statute became effective, the Department's "Non-Discretionary Minimum Custody Code F" (code F) restriction prohibited offenders from being considered for minimum security based on aspects of the crime.  It stated the following:  "Non-Discretionary Minimum Custody Restriction Code F:  Inmates currently convicted of murder of a public official, a crime while incarcerated or a crime involving loss of life are not to be considered for minimum unless a positive parole decision has been granted or are within two years of a defined release date."  Based on the language of code F, juvenile lifers who committed a crime involving loss of life were restricted; those lifers who had committed other offenses such as rape or armed robbery were not restricted.  Classification staff do not have the authority to disregard restrictions.

In addition to these restrictions, the department then had, and still has, amongst others, two discretionary overrides, codes R and S, which take into account aspects of the crime or an offender's criminal history warranting retention in higher custody:

> "Discretionary Over-Ride -- Higher Custody . . . Code
> R:  Nature of Offense/High Notoriety -- The facts or
> notoriety of the offense presents a seriousness that
> cannot be captured in the score.

" Code S:  Prior Criminal History -- The criminal history presents a seriousness that cannot be captured in the score."

All of these codes -- E, F, R, and S -- were in effect on July 25, 2014, the effective date of the amended statute.

The Legislature, recognizing that juveniles serving life sentences were restricted from minimum security throughout their incarcerations due to code E, specifically addressed this "categorical bar" by enacting the amended statute:  the department could no longer bar juvenile homicide offenders from minimum security categorically based on a life sentence, but could consider them for minimum security if and when their objective (point-based) score warranted such consideration.  See G. L. c. 119, § 72B.

On September 5, 2014, then Acting Commissioner Thomas Dickhaut issued a memorandum implementing both the holding in Diatchenko I and § 72B.  The memorandum stated that codes E and F could not be used for juvenile first- and second-degree homicide offenders, and those who had those codes would need to be reclassified.

3.  The petitioners.  Timothy Deal, now age thirty-one, was convicted of murder in the second degree for an offense committed in 2002, when he was the age of seventeen.  Sentenced to life imprisonment, Deal will be parole eligible as a matter of law as of January 29, 2017, when he will have been

incarcerated for fifteen years.  He is currently imprisoned at the Massachusetts Correctional Institution at Concord, a medium security facility.  On September 23, 2014, a classification board unanimously voted that Deal be placed in a minimum security facility.  The board noted that Deal had an objective classification score of four, had "[p]ositive housing/work evaluations," and was "program compliant."  Seven months later, the assistant deputy commissioner rejected the classification board's recommendation, citing "code R," i.e., "serious nature of offense."

Siegfried Golston, now age fifty-eight, was convicted of murder in the first degree in 1976 for an offense committed when he was the age of seventeen.  Originally sentenced to life without the possibility of parole, Golston has been imprisoned for forty years, mostly (and currently) at Old Colony Correctional Center (Old Colony), a medium security facility. For many years, Golston's objective point base classification scores have qualified him for placement in minimum security.  In 2014, a classification board again determined that Golston qualified for minimum security and recommended that he be so placed, noting his objective classification score of two, positive institutional adjustment, and program participation. The assistant deputy commissioner rejected the recommendation, citing code R:  "The facts or notoriety of the offense presents

a seriousness that cannot be captured in the score."  After becoming eligible for parole by virtue of Diatchenko I, Golston was considered for parole at a hearing held on January 29, 2015.  On May 1, 2015, the parole board denied Golston's application for parole "with a review in two years from the date of the hearing."

Jeffrey Roberio, now age forty-seven, was convicted of murder in the first degree in 1987, for an offense committed when he was the age of seventeen.  Originally sentenced to life imprisonment without the possibility of parole, Roberio has been incarcerated for almost thirty years, mostly (and currently) at Old Colony.  On October 9, 2014, a classification board recommended by a unanimous vote that Roberio be placed in a minimum security facility based on his objective classification score of three, his "positive institutional adjustment," and his "program participation."  Four months later, the assistant deputy commissioner rejected the classification board's recommendation, as follows:  "Serious nature of offense; several disciplinary reports throughout incarceration noted.  Override code R and T;[7] attorney letter and inmate appeal reviewed."  After becoming eligible for parole as a result of Diatchenko I,

---

[7] "Discretionary Over-ride -- Higher Custody . . . Code T" provides:  " Institutional Negative Adjustment -- The institutional adjustment presents a seriousness that cannot be captured in the score."

Roberio was considered for parole at a hearing held on June 25, 2015. On November 4, 2015, the parole board denied Roberio's request for release on parole "with a review in five years from the date of the hearing," i.e., June 25, 2020.

4. Procedural history. As of the effective date of the Legislature's amendment of § 72B (July 25, 2014), the petitioners each were "youthful offender[s]," see Commonwealth v. Okoro, 471 Mass. 51, 62 n.18, who "qualifie[d] for placement in a minimum security correctional facility based on objective measures determined by the department." G. L. c. 119, § 72B, as amended by St. 2014, c. 189, § 2. However, in each case, the assistant deputy commissioner invoked one or more of the department's "discretionary overrides" to reject the petitioners' respective requests for placement in minimum security (Deal, rejected on the basis of code R; Golston, rejected on the basis of code R; Roberio, rejected on the basis of codes R and T).

Because the assistant deputy commissioner's use of discretionary overrides to prevent the petitioners' placement in a minimum security facility is "final and cannot be appealed," 103 Code Mass. Regs. § 420.08(3)(i), the petitioners filed the instant petition for relief in July, 2015, seeking relief pursuant to G. L. c. 211, § 3, and G. L. c. 231A, alleging that the department's practice of categorically excluding all

objectively qualifying juvenile homicide offenders who have not received a positive parole vote from minimum security placement contravenes the 2014 amendment to G. L. c. 119, § 72B, and violates the petitioners' "meaningful opportunity for release based on demonstrated maturity and rehabilitation," Diatchenko II, 471 Mass. at 20, quoting Graham, 560 U.S. at 75, as guaranteed by the Eighth and Fourteenth Amendments and arts. 12 and 26.

In October, 2015, the department filed an opposition to the petition, asserting (1) that the commissioner or her designee has discretion to reject a juvenile homicide offender's request to be placed in a minimum security facility; (2) that department "practice" forbids any prisoner serving a life sentence with a possibility of parole from being placed in minimum security "unless and until" the prisoner has obtained a positive parole vote, and (3) that the department treats "juvenile murderers" who wish to be placed in a minimum security facility "no differently" from adult offenders, notwithstanding the Legislature's 2014 amendment to §72B.

Following the filing of a response by the petitioners, and two hearings before the single justice, the matter was reserved and reported to the full court.

Discussion. The petitioners argue that the department's practice of requiring a positive parole vote prior to placing

juvenile homicide offenders in minimum security contravenes the plain language of § 72B.  In their view, the "qualifying" event for minimum security placement is the inmate's objective classification score.  Thus, by requiring a positive parole vote, the department has added a condition to the statute that the Legislature did not intend.  Moreover, the petitioners argue, where the positive parole vote requirement is not a component of a statute, regulation, or the objective point base classification system, the department may not invoke discretionary placement restrictions to effectuate a practice otherwise proscribed by § 72B.  The petitioners also assert that the department's stated reasons for requiring juvenile homicide offenders to receive a positive parole vote prior to placement in a minimum security facility are not supported by the record.[8] Lastly, they argue that the department's practices violate the petitioners' constitutional right to a "meaningful opportunity" to obtain release on parole, because the parole board will not grant a parole permit to a juvenile homicide offender who has not successfully proved himself or herself in a minimum security facility.

The respondents counter that the petitioners' reading of § 72B conflates the provisions of the statute and thus

---

[8] Because we conclude that the classification practice of the department violates G. L. c. 119, § 72B, we do not address this contention.

misinterprets what it requires.  The department also acknowledges that it is department "practice" to "not permit those serving a life sentence to be housed in minimum security unless and until they receive a positive parole vote." According to the respondents, this practice has been in place since 2006, and is based on the department's efforts to balance resource allocation (reserving beds in minimum security facilities for those inmates who have dates of discharge to the community) and inmate risk management (preventing escapes and further crimes while on escape).  Despite this admitted practice, the respondents contend that juvenile homicide offenders are being provided with a "meaningful opportunity to obtain parole release based on demonstrated maturity and rehabilitation" because several juvenile homicide offenders have received a positive parole vote and been placed in minimum security facilities.[9]

1.  Section 72B.  The parties' dispute over the department's classification practices turns largely on their divergent interpretations of G. L. c. 119, § 72B.  Accordingly, we begin our analysis by considering the language of the statute.  "[S]tatutory language should be given effect

---

[9] As discussed infra, since Diatchenko v. District Attorney of Suffolk County, 466 Mass. 655 (2013) (Diatchenko I), was decided, eleven juvenile homicide offenders originally sentenced to life without the possibility of parole have been granted parole by the parole board.

consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result" (citation omitted).  Commonwealth v. Parent, 465 Mass. 395, 409 (2013).  "Courts must ascertain the intent of a statute from all its parts and from the subject matter to which it relates, and courts must interpret the statute so as to render the legislation effective, consonant with reason and common sense." Commonwealth v. George W. Prescott Publ. Co., 463 Mass. 258, 264 (2012).

Section 72B contains two separate decrees:  first, the department may not limit youthful offenders' access to certain programming solely because of their crimes or the duration of their incarceration; and second, the department may not categorically bar, based on a life sentence, the placement of a youthful offender in minimum security where the individual qualifies for such placement based on objective measures.  See G. L. c. 119, § 72B.

Quoting our decision in Okoro, 471 Mass. at 62, the petitioners ask us to interpret § 72B as requiring the department to ensure "that youthful offenders who are incarcerated are not restricted in their ability to take part in educational and treatment programs, or to be placed in a minimum security facility, solely because of the nature of their criminal convictions or the length of their sentences" (footnote

omitted).  This language was used in Okoro merely to summarize
the statute, and not to interpret it definitively.  Id.  The
petitioners' reading of it, however, would import the mandate of
the first statutory provision into the second, and prohibit the
department from considering the petitioners' crimes or duration
of their incarceration in rendering a classification decision.
We disagree, and conclude that the criteria in the first
sentence -- the inmate's crime or duration of their
incarceration -- do not carry over into the second sentence.
"[W]here the Legislature has carefully employed a term in one
place and excluded it in another, it should not be implied where
excluded" (citation omitted).  Commissioner of Correction v.
Superior Court Dep't of the Trial Court for the County of
Worcester, 446 Mass. 123, 126 (2006).  We cannot ignore the
Legislature's use of different criteria in each sentence, and do
not read the statute to provide that the department may not
consider a youthful offender's crimes or the duration of his or
her sentence in determining whether that individual qualifies
for placement in minimum security.

The language of § 72B plainly states that the department
may not absolutely bar juvenile homicide offenders from
placement in minimum security housing based on the fact that

they are serving a life sentence.[10] We reject the petitioners' argument that an individual's receipt of an objective classification score qualifying for minimum security classification requires the department to so classify that individual. It is apparent from regulatory framework that the initial objective classification score is a recommendation, and not a mandate, and thus merely qualifies an inmate for consideration for classification in minimum security.

It follows, then, that § 72B requires the department to make an individualized determination of a juvenile homicide offender's suitability for placement in minimum security.[11] As the petitioners concede, however, the department's consideration

---

[10] Although we need not resort to extrinsic aids to discern the Legislature's intent, the legislative history of G. L. c. 119, § 72B, also supports our interpretation. An earlier version of the bill stated: "If the department of correction and the department of youth services objectively determine that the person qualifies for placement in a minimum security correctional facility, the placement shall not be prohibited on the nature or status of the offense or the age of the person at the time of the commission of the crime." See 2014 Senate Doc. No. 2258, § 2. By removing the terms "nature or status of the offense" and "age of the person at the time of the commission of the crime," it appears that the Legislature did not intend to prohibit the department from considering these factors in its classification determinations.

[11] This conclusion is consistent with the department's own regulations, which emphasize that classification is an individualized process. See 103 Code Mass. Regs. § 420.08 (classification process "shall provide an opportunity for the reception staff members to become acquainted with each inmate through individual assessment, testing, and structured interviews").

of individuals may include the measures embodied in discretionary override codes R and S, that is, the facts of the inmate's crime or the prior criminal history of a juvenile homicide offender insofar as these criteria bear on their suitability for classification in minimum security.  Moreover, by permitting the department to consider such factors, the Legislature ensured that the twin goals of the classification process -- promoting "public safety" and "the responsible reintegration of offenders," see 103 Code Mass. Regs. § 420.07 -- are furthered, rather than undermined.

2.  Department practice.  Having concluded that § 72B requires the department to make individualized, case-by-case classification determinations for juvenile homicide offenders, we consider whether the department's practice of requiring a positive parole vote prior to placement in minimum security, as well as its use of codes R and S to effectuate this practice, violates the language of the statute.  We conclude that it does because it fails to undertake the type of individualized evaluation contemplated by the statute.

Section 72B prohibits the department from categorically barring a juvenile homicide offender based on a life sentence, and requires it to consider them for minimum security if and when their objective (point-based) score warrants such consideration.  As discussed, such consideration must take place

on a case-by-case basis. However, by the department's own stated practice, the petitioners have not received an individualized evaluation as to their suitability for minimum security classification because the department will not consider them unless and until they receive a positive parole vote. Additionally, although the petitioners concede that the department may consider the criteria embodied in discretionary override codes R and S, in rendering its decision, we agree with the petitioners that the record supports the conclusion that the department is currently using the codes solely as a means to effectuate its policy of requiring a positive parole vote. Indeed, the department acknowledges that the same juvenile offender whose placement in minimum security is blocked on the basis of a discretionary override would otherwise become transferable to minimum security on receipt of a positive parole vote.

The department's current classification practice therefore violates § 72B because it precludes the petitioners from being given the individualized consideration for minimum security due to them based on the language of the statute and the department's own regulations. We note that, according to the objective point base classification manual, a "rationale for any discretionary override MUST be provided" (emphasis in original). We agree with the petitioners that the provided rationale must

go beyond the mere recitation of the discretionary override. Otherwise, the use of the codes to block objectively qualifying youthful offenders from minimum security who have not received a positive parole vote amounts to a categorical bar based on a life sentence, as proscribed by § 72B.

Generally speaking, the classification process vests the commissioner or her designee with broad discretion to classify inmates. See Hastings v. Commissioner of Correction, 424 Mass. 46, 49-50 (1997). Therefore, nothing in this opinion should be construed to prohibit the department from considering a variety of factors in reaching a classification decision, including considerations such as public safety and resource allocation. However, in light of the language and purpose of § 72B, we conclude that the department must memorialize its rationale for denying placement in minimum security in writing, and may not preclude objectively qualifying juvenile homicide offenders from being considered for minimum security solely because they have not received a positive parole vote. Nor may the department use discretionary override codes R and S to effectuate this policy. Instead, the department must individually consider each inmate's suitability for classification in minimum security and provide a written explanation for its decision.[12]

---

[12] This case is before us on the reservation and report of the single justice, pursuant to our general superintendence

3. <u>Constitutional challenges</u>. The petitioners also contend that the department's practice of not classifying juvenile homicide offenders to minimum security unless and until they receive a positive parole vote violates the petitioners' constitutionally protected right to a meaningful opportunity to obtain release on parole.[13] Since December, 2013, when

---

powers under G. L. c. 211, § 3. Nothing in this opinion should be interpreted as creating a right of judicial review of an individual decision by the commissioner or her designee denying classification in minimum security, which is final and cannot be appealed. See 103 Code Mass. Regs. § 420.08(3)(i).

[13] In their petition to the single justice, the petitioners argued that the department's classification practices violate juvenile homicide offenders' constitutionally protected right to a meaningful opportunity for parole release based on demonstrated maturity and rehabilitation as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and arts. 26 and 12 of the Massachusetts Declaration of Rights. The single justice used the same language in reporting the matter to the full court.

Our prior decisions addressing the right to a "meaningful opportunity to obtain release" have not discussed the right's origin as deriving from the language of either the Fourteenth Amendment or art. 12, but rather from the prohibition against cruel and unusual punishments in both art. 26 of the Massachusetts Declaration of rights and the Eighth Amendment. See, e.g., <u>Diatchenko I</u>, 466 Mass. at 668. The petitioners do not make any argument -- in either their petition below or in their appellate brief -- as to whether either the Fourteenth Amendment or art. 12 creates a special liberty interest for juvenile homicide offenders serving life sentences with a possibility of parole. Accordingly, our discussion here addresses an individual's right to a "meaningful opportunity to obtain release" only as provided by the Eighth Amendment and art. 26. See <u>Schulman</u> v. <u>Attorney Gen</u>., 447 Mass. 189, 199 n.2 (2006) ("issues not briefed and argued should not be decided, especially when a question of constitutional law . . . is involved").

Diatchenko I was decided, eleven juvenile homicide offenders originally sentenced to life without the possibility of parole have been granted parole by the parole board. In each case, these individuals were not immediately released to the community on a parole permit, but rather were required to meet various conditions, including having spent a specified period of incident-free time in a minimum security facility. The petitioners argue that the department's practice of prohibiting placement in minimum security unless and until a juvenile homicide offender receives a positive parole vote effectively extends the life sentences of juvenile homicide offenders who are eligible for parole by delaying indefinitely their ability to begin the period of time that they will be required to serve in a minimum security facility. This, in the petitioners' view, prevents juvenile homicide offenders from "prov[ing] themselves in minimum," which in turn prevents such juveniles from obtaining a meaningful hearing in the first place. We disagree that any constitutionally protected interest is implicated by the department's practice.

In Diatchenko I, we held that the mandatory imposition of a life sentence without parole violates the prohibition against cruel and unusual punishments in both art. 26 and the Eighth Amendment. Diatchenko I, 466 Mass. at 668, citing Miller v. Alabama, 132 S. Ct. 2455, 2467-2469 (2012). We also held that a

juvenile homicide offender who is convicted of murder in the first degree and receives a mandatory sentence of life in prison must be afforded a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," and this opportunity must come through consideration for release on parole. Diatchenko I, supra at 674, quoting Graham, 560 U.S. at 75.

In Diatchenko II, we further determined that, in order to ensure that a juvenile homicide offender's opportunity for release through parole is meaningful, he or she must, in connection with an initial petition for release before the parole board, be afforded certain procedural protections, including access to counsel, access to funds for counsel and for expert witnesses if he or she is indigent, and, in limited circumstances, an opportunity for judicial review of the decision on their parole applications. Diatchenko II, 471 Mass. at 14. It appears that the petitioners now seek to expand this right further by asking the court to hold that juvenile homicide offenders have a constitutionally protected interest in being released to the community at the conclusion of their minimum duration of confinement. We decline to do so.

There is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." Greenholtz v. Inmates of the

Neb. Penal & Correctional Complex, 442 U.S. 1, 7 (1979). Accord Quegan v. Massachusetts Parole Bd., 423 Mass. 834, 836 (1996). Accordingly, in Diatchenko I, 466 Mass. at 674, we made clear that "[o]ur decision should not be construed to suggest that individuals who are under the age of eighteen when they commit murder . . . should be paroled once they have served a statutorily designated portion of their sentences." The petitioners' argument, however, amounts to a request to the court to find that juvenile homicide offenders have a constitutionally protected expectation to be released to the community after serving the statutorily prescribed portion of their sentences. The case law is clear, however, that no such expectation exists. See id. See also Graham, 560 U.S. at 75 (juvenile homicide offender is afforded "meaningful opportunity to obtain release" insofar as Eighth Amendment "prohibit[s] States from making the judgment at the outset that those offenders never will be fit to reenter society"; however, "[t]he Eighth Amendment does not foreclose the possibility that [a juvenile convicted of murder in the first degree] will remain behind bars for life" [emphasis added]).

Moreover, there is nothing in the record before us to indicate that the parole board considers a juvenile homicide offender's security level in determining parole suitability, as evidenced in the criteria of the parole board in issuing parole

decisions for lifers, as well as the written decisions of the parole board for juvenile homicide offenders. See Parole Board, Guidelines for Life Sentence Decisions, http://www.mass.gov/eopss/agencies/parole-board/guidelines-for-life-sentence-decisions.html [https://perma.cc/F6NZ-WUC3]. To the contrary, the decision to deny parole to petitioner Golston indicates that the parole board denied parole on the bases of Golston's lack of specific anger management and violence reduction programming, as well as the parole board's finding that Golston's parole plan was formative and not yet viable. Similarly, the decision as to petitioner Roberio indicates that the parole board denied parole because Roberio had failed to pursue rehabilitative programming to address his issues of substance abuse, anger, and violence, leaving the board with a "serious concern of whether he still presents a risk of harm to the community, and whether his release is compatible with the best interests of society."[14]

Accordingly, we reject the petitioners' constitutional challenge to the department's practice. Although the department may not continue to bar consideration of juvenile homicide offenders from classification in minimum security solely on the basis of their failure to receive a positive parole vote, the

---

[14] The petitioner Timothy Deal will not be eligible for parole until 2017.

practice does not amount to a constitutional violation because there is no constitutionally protected expectation that a juvenile homicide offender will be released to the community after serving a statutorily prescribed portion of his or her sentence.  See Diatchenko I, 466 Mass. at 674.

Conclusion.  For these reasons, we conclude that the department's current practice of using discretionary overrides to block objectively qualifying juvenile homicide offenders from placement in a minimum security facility unless and until the juvenile has received a positive parole vote contravenes the language and purpose of G. L. c. 119, § 72B, because it forecloses the individualized consideration of an inmate's suitability for classification in minimum security.  The matter is remanded to the county court, where the single justice will enter a judgment consistent with this opinion.

So ordered.