NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1390

WILLIAM M. SHIPPS

vs.

DEPARTMENT OF CORRECTION & others.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, William Shipps, filed a petition for contempt in the Superior Court against the defendant Department of Correction (department) and its agents for their alleged violation of directives of the Supreme Judicial Court (SJC).  Acting on cross motions for judgment on the pleadings, a Superior Court judge declined to hold the defendants in contempt and entered judgment in their favor.  The plaintiff timely filed a notice of appeal.  We affirm.

Background.  The plaintiff is a "juvenile homicide offender."  Deal v. Commissioner of Correction, 475 Mass. 307,

_____

[1] Carol A. Mici, as Commissioner of Correction, and Abbe E. Nelligan, as the commissioner's designee for classification.

308 n.4 (2016) (Deal I), S.C., 478 Mass. 332 (2017) (Deal II). At his annual classification review in January 2022, his objective classification score made him eligible for placement in a minimum security facility, and the departmental review board voted two-to-one to recommend transfer to minimum security. The minority recommended that Shipps remain at MCI-Norfolk for further programming and rehabilitation. In May 2022, the commissioner's designee, defendant Nelligan, adopted the minority view and utilized two discretionary override codes (codes R and U) to deny the transfer.

The plaintiff argues that Nelligan's written explanation for using codes R and U violated the SJC's directives in Deal II, 478 Mass. at 342-343, discussed infra.

Discussion. 1. Mootness. While this appeal was pending, after the plaintiff's classification review in 2024, the plaintiff was recommended for transfer, and then transferred, to a minimum security facility. Because the department and its agents are no longer impeding the plaintiff's transfer, they argue that his appeal from the denial of his petition for contempt should be dismissed as moot. Given that the issue underlying the contempt claim is not the plaintiff's placement, but rather the department's history of blocking the placement of juvenile homicide offenders in minimum security facilities, which required the SJC's intervention in Deal I and Deal II, we

2

are inclined to reach the merits.  See LaChance v. Commissioner of Correction, 475 Mass. 757, 767-768 (2016) (case not moot where conduct is capable of repetition as to same plaintiff such that plaintiff has ongoing personal stake in matter).

2.  Contempt.  In Deal II, the SJC gave the department specific instructions for using code R and code U to override objective classification scores that would otherwise warrant placement in a minimum security facility.[2]  With respect to code R, the court issued this directive:

> "[T]o ensure true individualized consideration, we now declare that, whenever code R is used as a discretionary override, the written explanation for the decision must explain in detail why this youthful offender's conduct in committing the murder is so significantly different in its seriousness as to reasonably distinguish it from the conduct of others and, in particular, other juveniles who committed murder."

Deal II, 478 Mass. at 342.  With respect to code U, the court declared as follows:

> "Because the use of code U is so inconsistent with the objective classification score's reliance on recent disciplinary reports and acts of violence, and because it is so broad in its scope and duration and conclusory in its language, we now declare that, whenever code U is used as a discretionary override, the written explanation for the

---

[2] "According to the [department's classification] manual, discretionary code R allows an override where '[t]he facts or notoriety of the offense presents a seriousness that cannot be captured in the score.' . . . Discretionary code U allows an override where an 'inmate['s] behavior, while not always negative enough to warrant disciplinary action, may serve to threaten security or undermine the exercise of proper control and maintenance of order within the institution.'"  Deal II, 478 Mass. at 337-338.

3

decision must explain in detail the specific conduct that justifies its application."

Id. at 343. The plaintiff argues that Nelligan's explanation for using codes R and U to block his transfer to minimum security in 2022 was not sufficiently detailed and, therefore, the defendants should be held in contempt, a remedy authorized by G. L. c. 231A, § 5.[3]

"To constitute civil contempt there must be a clear and undoubted disobedience of a clear and unequivocal command." United Factory Outlet, Inc. v. Jay's Stores, Inc., 361 Mass. 35, 36 (1972). See Birchall, petitioner, 454 Mass. 837, 851-852 (2009). The plaintiff bore the burden of proving the department's clear and undoubted disobedience by clear and convincing evidence. See id. at 852-853. "Where the order is ambiguous or the disobedience is doubtful, there cannot be a finding of contempt." Cooper v. Keto, 83 Mass. App. Ct. 798, 804 (2013), quoting Birchall, supra at 852.

To explain the use of code R, regarding the notoriety of the plaintiff's offense, Nelligan stated, "Code R applies due to the serious, violent, and premeditated nature of the offense in which a brother and sister were fatally shot within their own home and the brother's body was found on a blood-soaked bed and

_____

[3] The department acknowledges, and we agree, that the plaintiff stated a claim eligible for relief under G. L. c. 231A, § 5.

4

his sister was initially found alive on her bed suffering from a gunshot wound to the head from which she later succumbed to." To explain the use of code U, concerning why the plaintiff's conduct in prison might undermine control and order in a minimum security facility, Nelligan explained that the plaintiff had only recently begun to talk about "the atrocious nature of the offense . . . which warrants further addressing through participation in programs that address the causal factors of such conduct."[4]  Nelligan further explained why the combination of the plaintiff's crime and his failure to grapple with it made him unready for transfer, writing that he would be a risk to "a minimum-security facility and thus to public safety" because he had not yet acquired and "internalized the skills needed to be safely and securely housed at minimum security."

Although Nelligan's explanation for the use of code R could have been more detailed -- for example, she could have compared the plaintiff's crime to the crimes of other juvenile homicide offenders -- the plaintiff has not shown by clear and convincing evidence that the explanation amounted to clear and undoubted

---

[4] Nelligan credited the plaintiff's "vast participation in programming," but also noted that he denied shooting one of the victims and "presented information about his crime which is not supported by the facts of [the official version of] his case." Accordingly, the plaintiff required additional "programs that promote insight and empathy in order to understand the profound impact that they have had on others."

disobedience of the SJC's declarations in Deal II.  Unlike the department's explanations for the use of code R in Deal I, 475 Mass. at 314-315, Nelligan's explanation provided more than a blanket "serious nature of offense" statement.  She included specific details about the plaintiff's crime, including that one victim was found alive and suffering from a gunshot wound to the head and the other was found in a "blood-soaked bed."  The judge concluded, and we agree, that the explanation "at least arguably complie[d]" with Deal II's specificity requirement based on the reasonable inference that the details Nelligan provided were the factors that differentiated the plaintiff's crime from the crimes of other similarly situated offenders.

Nelligan's explanation regarding her use of code U also complied with the SJC's directives.  While we agree with the plaintiff that code U must be based on juvenile homicide offenders' conduct in prison and not their underlying offenses, see Deal II, 478 Mass. at 337-338, we disagree with the plaintiff's assertion that the department relied on his offense to invoke code U.  Nelligan cited the plaintiff's failure to address the root causes of his offense through programs and services, his denial of culpability, and his unwillingness to discuss his crimes as reasons for invoking code U.  These details sufficiently explained the plaintiff's specific conduct in prison, or lack thereof, prior to the 2022 classification

6

hearing that might have undermined the rehabilitative mission of a minimum security facility. See id. at 343. In any event, the explanation was not so generic as to show the clear and unequivocal disobedience required for a finding of contempt.

Judgment affirmed.

By the Court (Massing, Hand & Smyth, JJ.[5]),

Clerk

Entered:  December 17, 2024.

---

[5] The panelists are listed in order of seniority.