NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12751


COMMONWEALTH  vs.  KELLY D. RIDLEY, JR.



Barnstable.     December 9, 2022. - February 17, 2023.

Present:  Budd, C.J., Lowy, Cypher, Kafker, & Georges, JJ.


Homicide.  Assault and Battery by Means of a Dangerous Weapon.
    Witness, Expert.  Evidence, Expert opinion, Relevancy and
    materiality.  Practice, Criminal, Argument by prosecutor,
    Instructions to jury, Jury and jurors, Question by jury,
    Presumptions and burden of proof, Sentence, Capital case.
    Jury and Jurors.  Constitutional Law, Sentence.



Indictments found and returned in the Superior Court
Department on December 21, 2016.

The cases were tried before Robert C. Rufo, J., and a
motion for a new trial, filed on May 21, 2021, was considered by
Thomas J. Perrino, J.


Elizabeth Caddick for the defendant.
Mary Nguyen, Assistant District Attorney, for the
Commonwealth.


LOWY, J.  At a house party, in the early morning hours of

October 22, 2016, a series of verbal and physical fights broke

out between a number of party attendees, including the eighteen

year old defendant, Kelly D. Ridley, Jr., and the twenty-six year old victim, Thomas Russell.  During a brawl between the defendant and the victim, the defendant stabbed the victim nine times in the torso and leg, ultimately killing him.  Following a jury trial, the defendant was convicted of murder in the first degree on the theory of extreme atrocity or cruelty.[1]  Following his convictions, the defendant filed a motion for a new trial, which was denied.

In this consolidated appeal, the defendant argues that a new trial is required because (1) the judge excluded expert testimony on late adolescent brain development; (2) the prosecutor misstated the law of voluntary manslaughter during closing argument; (3) the judge failed to provide an instruction on involuntary manslaughter; and (4) the judge abused his discretion in responding to a jury question.  Additionally, the defendant contends that, in light of his age at the time of the crimes and the current research on late adolescent brain development, we should extend the principles underlying Miller v. Alabama, 567 U.S. 460 (2012), and its State law counterpart, Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655 (2013), S.C., 471 Mass. 12 (2015) (Diatchenko I), and conclude that his sentence of life without the possibility of

---

[1] The defendant also was convicted of two counts of assault and battery by means of a dangerous weapon.

parole violates art. 26 of the Massachusetts Declaration of Rights and the Eighth Amendment to the United States Constitution.  Finally, the defendant asks us to exercise our authority under G. L. c. 278, § 33E, and reduce his conviction of murder in the first degree to murder in the second degree or voluntary manslaughter.

We conclude that there was no reversible error.  After thorough review of the record, we further discern no reason to exercise our extraordinary authority under G. L. c. 278, § 33E, to reduce the verdict to a lesser degree of guilt or order a new trial.

Background.  1.  Trial.  We recite the facts as the jury could have found them.

On the evening of October 21, 2016, the victim and his cousin, David Gonsalves, went to a local bar and met up with a group of the victim's friends, including Joseph France and Magnum Desouza.  Priscilla Coelho, a friend of both the victim and the defendant, also was at the bar that night.  She invited the victim and his group of friends to a house party hosted by the defendant.

The group proceeded to the defendant's house after the bar closed.  A dispute arose in the kitchen shortly after the victim arrived at the party, which ultimately caused a disagreement between the victim and another party attendee, Ricky Powell.

This disagreement eventually escalated to a physical altercation between the victim and Powell outside in the street in front of the house.  A crowd of people followed the two outside to watch them fight.

At some point during the fight between the victim and Powell, the defendant attempted to jump into the fray.  Gonsalves eventually became involved as well, and a physical altercation ensued between the defendant and Gonsalves; the two wrestled each other on the ground, throwing punches, while "talking trash."  France ultimately broke up the fight between the victim and Powell, and Desouza separated the defendant and Gonsalves.  In doing so, Desouza attempted to calm the defendant down, but he appeared "determined."

After both physical altercations seemingly ended, the victim walked up the driveway toward the house.  The defendant then "came out of nowhere" and struck the victim on his head or upper back with a metal scooter.  The defendant remarked, "How do you like that, bitch?"  Upon being struck with the scooter, the victim appeared "shocked."  He stumbled a bit, turned around, and threw the defendant in the bushes, stating words to the effect of, "Go inside little man."  The defendant ran to the steps of the house and started shouting that he was going to get his gun.  Gonsalves returned the shouting, "calling [the

defendant's] bluff," and taunting the defendant that he was not going to follow through.

As the victim, Desouza, and Gonsalves walked down the driveway to leave, the defendant came out of the house, now shirtless, holding a five to six inch bladed knife in his right hand. The defendant began waving the knife around, asking, "Who wants it?" The defendant proceeded to the end of the driveway and chased Gonsalves into the middle of the street with the knife. The victim, who had walked farther away at this point, turned and ran toward the defendant. The defendant still was holding the knife; the victim was unarmed. The victim threw a punch at the defendant, and a physical fight between the two followed. During this fight, the defendant swung both of his fists repeatedly into the victim's midsection, including the fist that was holding the knife. The defendant stabbed the victim nine times, striking both the torso and the left leg. Michael James, a "father-like figure" to the defendant,[2] attempted to break up the fight by grabbing the defendant, and the defendant stabbed James in the stomach. Once the defendant and the victim were separated, the defendant ran inside the house.

---

[2] None of the witnesses at trial knew or testified to the precise familial relationship between the defendant and James, but defense counsel in closing referred to James as the defendant's uncle.

The victim took a couple steps before falling to the ground and exclaiming, "I got stabbed." Desouza and France came to his aid. The victim's abdomen and pants were covered in blood, and there was a hole in his stomach and groin area. His intestines were protruding from his body. The victim still was awake, with his eyes wide open, and he was holding his stomach. He looked France in the eyes, while France held his hand. France attempted to talk to the victim and keep him awake, but the victim, struggling to breathe, could not respond. The victim remained conscious for a period of time, but when police and paramedics arrived, the victim was unconscious and nonresponsive. The paramedics transported the victim to a hospital, where he later died of his stab wounds. An autopsy revealed that all nine stab wounds contributed to his death, but two had the potential to be fatal to the exclusion of the others.

At some point before police and paramedics arrived at the scene, the defendant fled out the back door of the house. He traveled to a number of locations before eventually being found by police the next day while being treated for minor injuries at the same hospital where the victim died.

2. <u>Prior proceedings</u>. The defendant was indicted by a grand jury on charges of murder in the first degree of the victim, assault and battery by means of a dangerous weapon

(metal scooter) against the victim, and assault and battery by means of a dangerous weapon (knife) against James. Before trial, the defendant moved in limine to admit expert testimony regarding the general characteristics of adolescent brain development. The judge excluded the testimony, and trial commenced in October 2018.

At trial, the defendant conceded that he stabbed and killed the victim,[3] but argued that the killing was voluntary manslaughter based on heat of passion induced by reasonable provocation or sudden combat. The defendant was found guilty on all of the indictments and sentenced to life without the possibility of parole on the charge of murder in the first degree, as statutorily required, G. L. c. 265, § 2, and to two concurrent sentences of from eight to ten years on the charges of assault and battery by means of a dangerous weapon. The defendant timely appealed. Following his conviction, the defendant moved for a new trial, arguing that the judge erred in responding to a jury question about the Commonwealth's burden of proof, that his trial counsel was ineffective in failing to object to the judge's response, and that his sentence of life without the possibility of parole was unconstitutional. The defendant's motion was denied, and his appeal from the denial of

---

[3] The defendant also conceded that he was guilty of both counts of assault and battery by means of a dangerous weapon.

his motion for a new trial was consolidated with his direct appeal.

Discussion. 1. Expert testimony. Prior to trial, the defendant filed a motion in limine to admit expert testimony by Dr. Frank DiCataldo on adolescent brain development "to provide the jury with some background of the general mental development of someone in their late adolescence," to assist them in determining whether the defendant possessed the requisite intent to commit murder. In support of his motion, the defendant submitted a transcript of DiCataldo's testimony on adolescent brain development from another criminal case in which the defendant also was eighteen years old at the time of his offense. The Commonwealth moved to exclude the proposed testimony on the basis that DiCataldo had not conducted an individualized examination of the defendant or a review of his records, and that expert testimony regarding the general characteristics of adolescent brain development would not assist the jury in determining the defendant's guilt. Following a hearing, the judge allowed the Commonwealth's motion to exclude the testimony.[4]

The defendant argues on appeal that the judge abused his discretion in excluding DiCataldo's testimony and that he was

---

[4] The judge allowed the motion "without prejudice." The defendant did not renew the motion.

deprived of the right to present a defense under the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  We conclude that the judge did not err in excluding the proposed expert testimony.

Generally, expert testimony may be admissible whenever "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[5]  Mass. G. Evid. § 702(a) (2022).

---

[5] To the extent that we have at times stated that this standard requires that the expert testimony be beyond the common knowledge or experience of jurors to be admissible, we clarify that the primary focus of admissibility is whether the expert testimony will help the trier of fact, even where the subject matter of the testimony "may be within the knowledge or common experience of the trier of fact."  Commonwealth v. Little, 453 Mass. 766, 768 (2009).  Rule 702 of the Federal Rules of Evidence similarly uses a "helpfulness standard."  See P.C. Giannelli, Understanding Evidence 316 (5th ed. 2018) (Giannelli).  See also Fed. R. Evid. 702(a) (expert testimony may be admissible where "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue").  This standard is a more liberal formulation of the common-law standard, which asked whether expert testimony was necessary because the subject matter was beyond the ken or comprehension of lay persons.  Giannelli, supra.  Rule 702 of the Federal Rules of Evidence rejects the necessity test:  "The question under Rule 702 is not whether the jurors know something about this subject, but whether the expert can expand their understanding in a relevant way."  Id. at 316 n.9, quoting Coble v. State, 330 S.W.3d 253, 288 (Tex. Crim. App. 2010), cert. denied, 564 U.S. 1020 (2011).  The same standard applies under our common-law rules of evidence.

See Commonwealth v. Little, 453 Mass. 766, 768 (2009). "This condition goes primarily to relevance." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591 (1993). "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence and (b) the fact is of consequence in determining the action." Mass. G. Evid. § 401. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful" (citation omitted). Daubert, supra. See Ready, petitioner, 63 Mass. App. Ct. 171, 179 (2005) (expert testimony on sexual interest diagnostic test properly excluded where test did not concern issues before jury). "The decision to exclude expert testimony rests in the broad discretion of the judge and will not be disturbed unless the exercise of that discretion constitutes an abuse of discretion or other error of law." Commonwealth v. Fernandes, 487 Mass. 770, 778 (2021), cert. denied, 142 S. Ct. 831 (2022), quoting Palandjian v. Foster, 446 Mass. 100, 104 (2006).

The defendant contends that we approved of the admission of this type of expert testimony on the general principles and characteristics of adolescent brain development in Commonwealth v. Okoro, 471 Mass. 51, 66-67 (2015). We did not; the defendant's reliance on Okoro is misplaced. In Fernandes, we emphasized that our conclusion in Okoro hinged on the connection made between the expert testimony on adolescent brain

development and the individual defendant in that case. See Fernandes, 487 Mass. at 781-782 ("The ability of an expert to testify with respect to the individual defendant specifically is critical"). Specifically, in Okoro, supra at 66, the expert testified about how the development of adolescent brains "could inform an understanding of [the] particular juvenile's capacity for impulse control and reasoned decision-making" (emphasis added). To the extent that the expert in Okoro testified in general terms about the adolescent brain, he did so to compare the defendant's specific condition of "'borderline deficient' cognitive functioning" to that of adolescents generally. Id. at 53 & 64 n.21. Indeed, in Okoro we concluded that, although expert testimony specific to the defendant was admissible because it offered the jury assistance in determining whether the defendant was able to form the requisite intent at the time of the incident, "the trial judge was correct to preclude the defendant from putting forward evidence that would have suggested it was impossible for anyone the defendant's age to formulate the necessary intent to commit this crime" because "the Legislature has clearly indicated that youth in the defendant's age group are considered capable of committing murder." Id. at 65. See Commonwealth v. Ogden O., 448 Mass. 798, 805 n.6 (2007) ("respect for the legislative process means that it is not the province of the court to sit and weigh

conflicting evidence supporting or opposing a legislative enactment" [citation omitted]).

Applying those principles in Fernandes, we held that a judge "may allow the introduction of expert testimony solely with respect to 'general principles and characteristics of the undeveloped adolescent brain' only when it is accompanied by other evidence, such as testimony by a different expert, or medical or school records, specific to the defendant." Fernandes, 487 Mass. at 782. We explained that, without evidence pertaining to the particular defendant, "evidence of the 'general principles and characteristics of the undeveloped adolescent brain' . . . is inadmissible" because "the expert's testimony would present the jury with the impermissible situation discussed in Okoro, 471 Mass. at 65-66," namely, by allowing the jury to conclude, based on the testimony, that any person in the defendant's age group could not form the requisite intent for murder. See Fernandes, supra at 782 & n.10. Because such a conclusion would impermissibly contradict a determination already made by the Legislature, the expert testimony would not assist the jury in resolving a fact in issue. Distilled to its essence, expert testimony on adolescent brain development in general is not helpful because it is not relevant. While arguably probative of intent, it is not material -- whether generally a person in the defendant's age group can form the

requisite intent for murder is not at issue. The Legislature has spoken definitively on the matter. See G. L. c. 265, § 2.

Here, the defendant proffered no other evidence specific to himself to accompany the proposed expert testimony by DiCataldo regarding the general principles and characteristics of late adolescent brain development. The proposed testimony thus was inadmissible, and the judge properly excluded it.

2. Closing argument. The defendant next argues that the prosecutor misstated the law of voluntary manslaughter during closing argument. Because the defendant did not object, we review to determine whether any error created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Muller, 477 Mass. 415, 431 (2017).

"In closing argument, '[l]awyers shall not and must not misstate principles of law.'" Commonwealth v. Bins, 465 Mass. 348, 367 (2013), quoting Commonwealth v. Haas, 373 Mass. 545, 557 (1977), S.C., 398 Mass. 806 (1986). Prosecutors "may, however, argue 'forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence.'" Commonwealth v. Carriere, 470 Mass. 1, 19 (2014), quoting Commonwealth v. Kozec, 399 Mass. 514, 516 (1987). "Remarks made during closing arguments are considered in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." Carriere,

supra, quoting Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 231 (1992).

During closing argument, the prosecutor made the following statements, the underlined portions of which the defendant now challenges:[6]

> "And think about it.  Reasonable provocation.  You get punched.  To believe that that's reasonable provocation, anytime there was a fist fight, you would have the ability and the right to eviscerate someone?  I suggest not. . . .

> "Respectfully suggest to you that all of this evidence of going the opposite direction of Cape Cod Hospital, not going to the hospital, going in the opposite direction right after the crime, and then not going there for another seven hours and then being seen to have superficial injuries,[7] that sudden combat, a reasonable person would not be overcome to the point of not being able to think by being punched. . . .

> "I'm going to ask you to use your common sense, use your life experience and consider what would a reasonable person feel or do in that situation?  A punch, then warranting the taking of a life, transporting you to a heat of passion where you don't know what you're doing?  The evidence shows

---

[6] The defendant specifically challenges the emphasized statements.  We place the challenged statements in context, as we must.  See Carriere, 470 Mass. at 19.

[7] We do not view the prosecutor's reference to the defendant's injuries as "superficial" as a misstatement of law that a defendant must be seriously injured to support a verdict of voluntary manslaughter.  As the defendant argues, "even a single blow from the victim can constitute reasonable provocation," Commonwealth v. Acevedo, 446 Mass. 435, 444 (2006), but the prosecutor here was entitled to argue that the evidence that the defendant's injuries were minor suggested the blows he sustained would not sufficiently provoke a reasonable person in the circumstances, see Commonwealth v. Rembiszewski, 363 Mass. 311, 321 (1973) (evidence of scratches on defendant's face insufficient for reasonable provocation).

Mr. Ridley knew what he was doing.  He was murdering Thomas Russell."  (Emphases added.)

We have little trouble concluding that the latter two statements, viewed in context, were not assertions of law by the prosecutor but, rather, were forceful arguments that the evidence in this case did not support a verdict of voluntary manslaughter based on reasonable provocation or sudden combat.  See Commonwealth v. Yat Fung Ng, 489 Mass. 242, 257 (2022), S.C., 491 Mass. 247 (2023) ("Reasonable provocation is provocation [deemed adequate in law] by the person killed . . . that would be likely to produce such a state of passion, anger, fear, fright, or nervous excitement in a reasonable person as would overwhelm his capacity for reflection or restraint and did actually produce such a state of mind in the defendant" [citation omitted]); Commonwealth v. Brea, 488 Mass. 150, 157 (2021) ("Sudden combat is a form of reasonable provocation.  It involves a sudden assault by the person killed . . . and the defendant upon each other" [quotations and citations omitted]).

The first statement, however, is a closer call, and it is difficult to discern the statement's meaning.  It is phrased broadly enough that it could be interpreted as stating that a finding of reasonable provocation is equivalent to a conclusion that the killing was justified, which is an incorrect statement of law.  See Commonwealth v. Rivera, 482 Mass. 259, 271 (2019),

citing Commonwealth v. Glover, 459 Mass. 836, 842 (2011)

(justification and mitigation "have distinct meanings in the

law"; "justification defense . . . could result in acquittal,

and mitigation defense, such as heat of passion, . . . at best

yields conviction of lesser offense of voluntary manslaughter").[8]

Nevertheless, this statement was isolated.  The jury were told

on several occasions that the judge provides the instructions of

law.  And the judge's instructions properly stated the law of

voluntary manslaughter, including reasonable provocation.  We

presume that the jury followed these instructions.  See Rivera,

supra.  We conclude, as a result, that this passing statement

did not create a substantial likelihood of a miscarriage of

justice.[9]

---

[8] Legal justification for a killing renders an intentional homicide noncriminal.  See Commonwealth v. Nardone, 406 Mass. 123, 130-131 (1989).  Examples of legal justification include, inter alia, "accident, mistake, self-defense, and defense of another."  Commonwealth v. McLaughlin, 431 Mass. 506, 514 n.7 (2000).  The defendant did not assert a justification defense at trial.

[9] As a result, the defendant's claim that his counsel was ineffective for not objecting to the prosecutor's closing argument fails.  Commonwealth v. Kolenovic, 478 Mass. 189, 192-193 (2017), quoting Commonwealth v. Gulla, 476 Mass. 743, 745-746 (2017) ("In the review of cases involving murder in the first degree, '[r]ather than evaluating an ineffective assistance claim under the traditional standard of Commonwealth v. Saferian, 366 Mass. 89, 96 [1974], . . . we apply the standard of G. L. c. 278, § 33E, to determine whether there was a substantial likelihood of a miscarriage of justice'").  See Commonwealth v. Kosilek, 423 Mass. 449, 457 (1996), quoting Commonwealth v. Waite, 422 Mass. 792, 807 (1996) ("[I]f an error

3.  Involuntary manslaughter instruction.  The defendant claims that the judge erred in denying his request for an instruction on involuntary manslaughter based on the evidence that he brought a knife into the situation by carrying it down the driveway.  "Involuntary manslaughter is an unlawful homicide unintentionally caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct."  Commonwealth v. Lopez, 485 Mass. 471, 484 (2020), quoting Commonwealth v. Carrillo, 483 Mass. 269, 275 (2019).  "An instruction on involuntary manslaughter is required where any view of the evidence would permit a finding of manslaughter and not murder."  Commonwealth v. Moseley, 483 Mass. 295, 303 (2019), quoting Commonwealth v. Pierce, 419 Mass. 28, 33 (1994).  "When it is obvious, however, that the risk of physical harm to the victim created a plain and strong likelihood that death will follow, an instruction on involuntary manslaughter is not required."  Moseley, supra, quoting Pierce, supra.  "When determining whether such an instruction was required, we consider the evidence in a light most favorable to the defendant."  Commonwealth v. Tague, 434 Mass. 510, 518 (2001), cert. denied, 534 U.S. 1146 (2002).

not objected to by trial counsel does not create a substantial likelihood of a miscarriage of justice . . . , a claim of ineffective assistance of counsel with respect to such error will not succeed").

Here, viewing the evidence in the light most favorable to the defendant, the defendant was not entitled to an instruction on involuntary manslaughter. The killing was not the result of the defendant merely bringing out the knife and carrying it down the driveway. Rather, the evidence was that the defendant swung the knife nine times into the unarmed victim's leg and abdomen. The act of doing so clearly created a plain and strong likelihood that death would follow. See Commonwealth v. Concepcion, 487 Mass. 77, 92, cert. denied, 142 S. Ct. 408 (2021). See also Lopez, 485 Mass. at 485 ("Because it is obvious that stabbing the victim created a plain and strong likelihood that death would follow, an involuntary manslaughter instruction was not warranted"). There was no error.

4. Response to jury question. Approximately two and one-half hours into deliberations, the jury sent a note to the judge with several questions and statements. Relevant here, one such statement asserted: "Jury in agreement with charge with the exception of whether or not Commonwealth has proven without reasonable doubt there were mitigating circumstances." After the judge read the jury's note to the prosecutor and defense counsel at sidebar, he provided each with a copy of the note and ordered a brief recess for both to consider their proposed responses.

When counsel reconvened at sidebar, the judge suggested that the relevant statement needed "further clarification" because it was "not . . . worded in accordance with the [c]ourt's instruction." Specifically, the judge commented that, contrary to the jury's note, the Commonwealth must "prove beyond a reasonable doubt that there were no mitigating circumstances. Not that there were, [but] that there were no." See Commonwealth v. Acevedo, 427 Mass. 714, 716 (1998) (correct rule is that Commonwealth must prove absence of mitigating circumstances). The prosecutor remarked that the jury had an audio recording of the jury instructions with them in the deliberation room. Notably, the jury also were provided an outline of the audio recording, which listed the time in the recording that each individual instruction could be located.

The prosecutor proposed that the judge respond to the jury's statement by advising the jury of their ability to replay the judge's instructions. Defense counsel agreed, stating, "I think that makes some sense to instruct them where to listen, and they could listen to it as a group, play it, stop it, play it, stop it." The judge, however, expressed some hesitancy in telling the jury where exactly in the recording they should begin listening because, in addition to the instruction on voluntary manslaughter, other instructions, such as the instructions on murder in the first degree, also stated that the

Commonwealth has the burden to prove that there were no mitigating circumstances.  Defense counsel, in response, proposed that the judge ask the jury to "listen to those portions of the instructions . . . beginning at first degree and through voluntary manslaughter.  That way, we're not putting our thumb anywhere to push them in one direction or the other."  Thereafter, the judge called the jury into the court room to respond to their note.

In addressing the statement at issue, the judge instructed the jury as follows:

> "With the exception of whether or not the Commonwealth has proven without reasonable doubt there were mitigating circumstances.  So I'm just reading what you wrote.  And what I respectfully suggest, and this is why I did it, is that you take some time and listen to the instructions on the audio tape, and don't tell me whether you have or not.  But our court monitor has given you an outline that refers you back to the time within the CD so you can fast forward it, and . . . you can quickly go to those sections that you want to listen to, understanding that my instructions as a whole are important, all of my instructions are equally important as I told you that.

> "So, I, again, don't want to presuppose what you're asking, and I'm not being critical.  Please forgive me.  I just am not able to answer the question, because it needs further clarification."

The judge instructed the jury to continue their deliberations, emphasizing once again that the Commonwealth bears the burden to prove all the elements of the charged offenses.  The judge concluded:  "At this juncture, I'd ask you to go back, listen to the recording if that's helpful.  If you have further questions,

I'm happy to receive them from you.  If you want to ask questions right away before listening, you can do that as well." The jury returned to the deliberation room and asked no additional questions prior to returning verdicts of guilty the following day.

On appeal, the defendant argues that the judge abused his discretion in responding to the jury's statement.  Specifically, he argues that, faced with the jury's misstatement that the Commonwealth must prove, rather than disprove, mitigating circumstances, the judge was required to forcefully reinstruct the jury on voluntary manslaughter and alert them explicitly of the Commonwealth's burden of proof.

"The proper response to a jury question must remain within the discretion of the trial judge, who has observed the evidence and the jury firsthand and can tailor supplemental instructions accordingly."  Commonwealth v. Monteagudo, 427 Mass. 484, 488 (1998), quoting Commonwealth v. Waite, 422 Mass. 792, 807 n.11 (1996).  See Commonwealth v. Watkins, 425 Mass. 830, 840 (1997) ("The necessity, scope, and character of a judge's supplemental jury instructions are within his or her discretion").  "[B]efore a judge responds to a jury communication of legal significance . . . , counsel should be given the opportunity to assist the judge in framing an appropriate response and to place on record any objection they might have to the course chosen by the

judge."  Commonwealth v. Nelson, 468 Mass. 1, 16 (2014), quoting Commonwealth v. Floyd P., 415 Mass. 826, 833 (1993).  Here, defense counsel was given such an opportunity; he agreed with the judge's course of action and lodged no objection to the judge's response to the jury question.  Thus, we review to determine whether there was error and, if so, whether the error created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Scott, 428 Mass. 362, 366 (1998), S.C., 437 Mass. 1008 (2002).

We conclude that there was no abuse of discretion.  "The judge's discretion to formulate a response is broad," Monteagudo, 427 Mass. at 488, and "[w]e evaluate the adequacy of a supplemental instruction in the context of the entire charge," Commonwealth v. West, 487 Mass. 794, 804 (2021).  It is undisputed that the jury instructions given at the close of evidence, which were memorialized verbatim in the audio recording, accurately and thoroughly conveyed that the Commonwealth bore the burden to prove that there were no mitigating circumstances.  In fact, this precise instruction was repeated no less than seven times during the main jury charge. See Watkins, 425 Mass. at 840 ("We presume that a jury follow all instructions given to [them] . . .").

Based on the jury's statement that they were "in agreement with charge" except as to "whether or not Commonwealth has

proven without reasonable doubt there were mitigating circumstances," the judge could not discern confidently which offense their statement concerned; the given instructions on murder in the first degree, murder in the second degree, and voluntary manslaughter each contained statements addressing the Commonwealth's burden to disprove mitigating circumstances. The judge therefore concluded that the jury's statement needed clarification.

Rather than provide a specific instruction on voluntary manslaughter, as the defendant now argues he should have, the judge agreed with defense counsel's suggestion to not "push [the jury] in one direction" and instead pointed the jury to the audio recording as a whole, guided by the outline. The outline contained headings for each offense and the accompanying instructions, including headings entitled "No Mitigating Circumstances" under each theory of murder in the first degree, and "What is a Mitigating Circumstance?" under voluntary manslaughter. This allowed the jury to direct themselves to the portion of the instructions giving them pause. Significantly, the judge encouraged the jury to clarify their statement or ask additional questions, if they had them, after listening. It was within the judge's considerable discretion to respond in this

manner.[10]  See Scott, 428 Mass. at 367 (no abuse of discretion

where "judge was unclear what the jurors were asking and, rather

than confuse them, the judge sought further clarification of the

question which concerned the jurors").

The defendant argues that, because the judge used the word

"suggest" when he initially told the jury to listen to the

recording, we cannot know whether the jury actually listened to

the recording of the judge's instructions, and a substantial

likelihood of miscarriage of justice therefore resulted.  We

disagree.  Considering all of the judge's statements to the jury

together and in context, rather than in isolation, his response

clearly reflected an instruction for the jury to clarify their

statement by listening to the audio recording.  See Commonwealth

v. Stokes, 440 Mass. 741, 750 (2004), S.C., 460 Mass. 311 (2011)

("adequacy of instructions is determined by their over-all

impact on the jury").  The absence of any follow-up questions or

clarification from the jury "suggests that their confusion was

dispelled."  Monteagudo, 427 Mass. at 489.  "The jurors may

withdraw a question or return a verdict before a question is

---

[10] Contrary to the defendant's argument, it was sufficient
for the judge to use an audio recording of the instructions,
rather than a written version, especially where, as here, the
jury were provided the outline.  See Commonwealth v. Baseler,
419 Mass. 500, 505 (1995) ("a tape recording is not only a
reasonable procedure by which to make the judge's instructions
available to the jury, but also is comparable to written
instructions").

answered." Scott, 428 Mass. at 367. The jury were "in the best position to determine whether the additional instruction was necessary," and by returning their verdicts without clarifying their statement, they demonstrated that they did not need further response from the judge. Id.

The jury's misstatement in this case -- that the Commonwealth is required to prove mitigating circumstances beyond a reasonable doubt -- is not unfamiliar or surprising. The concept that the Commonwealth bears the burden to disprove mitigating circumstances is difficult to frame, and we have decided a number of cases where judges have stated the concept incorrectly during jury instructions.[11] However, even where a judge has misstated the Commonwealth's burden in the very same manner as the jury did here, we have not found a substantial likelihood of a miscarriage of justice where "the center of gravity" of the judge's instructions was not "strongly on the

---

[11] This error -- where a judge instructs the jury that the Commonwealth must prove mitigating circumstances beyond a reasonable doubt -- has been referred to as the Acevedo error. See Acevedo, 427 Mass. at 716 (judge instructed jury that Commonwealth "must prove three elements beyond a reasonable doubt," including that "the defendant injured [the victim] as a result of sudden combat or in the heat of passion or using excessive force in self defense"). See, e.g., Commonwealth v. Brum, 441 Mass. 199, 205 (2004); Commonwealth v. Lynch, 439 Mass. 532, 543, cert. denied, 540 U.S. 1059 (2003); Commonwealth v. Sirois, 437 Mass. 845, 857 (2002); Commonwealth v. Lapage, 435 Mass. 480, 484-486 (2001); Commonwealth v. Simpson, 434 Mass. 570, 589 (2001).

side of the misstatement" (citation omitted).  Commonwealth v. Fickling, 434 Mass. 9, 20 (2001).  See, e.g., Commonwealth v. Lynch, 439 Mass. 532, 543-544, cert. denied, 540 U.S. 1059 (2003) (judge provided two correct instructions and two incorrect instructions, but "repeatedly emphasized that the Commonwealth bears the burden of proof beyond a reasonable doubt on all the elements of the crime charged"); Fickling, supra at 19-20 (two correct instructions sandwiched between two incorrect instructions, but it was clear that correct instructions carried more weight).  Contrast Acevedo, 427 Mass. at 716-717 (new trial required where judge incorrectly instructed on burden of proof as to provocation in main charge twice, with one correct instruction, and repeated incorrect instruction in supplemental charge).

In these circumstances, where the jury were correctly, consistently, and repeatedly instructed in the main charge that the Commonwealth bears the burden to prove that there were no mitigating circumstances, were provided an audio recording of those instructions, and were encouraged to clarify their statement or ask additional questions after listening to the recording, but did not do so, it would be entirely speculative, and remote in the extreme, to conclude that the jury applied an incorrect burden of proof in reaching their verdict.  See Watkins, 425 Mass. at 841.  See also Commonwealth v. Torres, 420

Mass. 479, 490-491 (1995) ("Reviewing the whole charge, including the judge's emphatic and repeated statements that only the Commonwealth -- and never the defendant -- bore any burden, we believe that the jury could not have concluded that the judge's misstatement created an unconstitutional presumption relieving the State of its burden of persuasion beyond a reasonable doubt of every element of deliberately premeditated murder in the first degree").  We discern no substantial likelihood of a miscarriage of justice.[12]

5.  <u>Constitutionality of life sentence without possibility of parole</u>.  The defendant argues that, considering his age of eighteen at the time of crimes and the surrounding circumstances, the reasoning in <u>Diatchenko I</u>, 466 Mass. at 667-671, and <u>Miller</u>, 567 U.S. at 479-480, commands a conclusion that his sentence of life without the possibility of parole is unconstitutional under art. 26 and the Eighth Amendment.  Since we concluded in <u>Diatchenko I</u> that a life sentence without the possibility of parole for individuals under the age of eighteen violates art. 26, "we repeatedly have declined to extend its holding to individuals over eighteen years of age." <u>Commonwealth</u> v. <u>Watt</u>, 484 Mass. 742, 755 (2020).

---

[12] Therefore, the defendant's claim of ineffective assistance based on counsel's failure to object to the judge's response is unavailing.  See <u>Kolenovic</u>, 478 Mass. at 192.

Recently, however, in Watt, we concluded that "it likely is time for us to revisit the boundary between defendants who are seventeen years old and thus shielded from the most severe sentence of life without the possibility of parole, and those who are eighteen years old and therefore exposed to it." Id. at 755-756. In order to do so, we determined that it was necessary for there to be "an updated record reflecting the latest advances in scientific research on adolescent brain development and its impact on behavior." Id. at 756. We therefore remanded that case to the Superior Court for a development of the record to "allow us to come to an informed decision as to the constitutionality of sentencing young adults to life without the possibility of parole." Id.

The defendant acknowledges that any decision we make based on a developed record regarding the constitutionality of a life sentence without the possibility for parole for individuals over eighteen years of age will be applicable to him. See Commonwealth v. Penn, 472 Mass. 610, 628 (2015), cert. denied, 578 U.S. 925 (2016) (rules announced in Miller and Diatchenko I given retroactive effect). Nonetheless, he contends that we should make this constitutional determination on the record before us. Because the record in this case does not contain the necessary information for us to "come to an informed decision"

on this important constitutional question, we decline to do so here.  See Watt, 484 Mass. at 756.

6.  Review pursuant to G. L. c. 278, § 33E.  The defendant asks us to exercise our authority pursuant to G. L. c. 278, § 33E, to reduce his conviction of murder in the first degree to murder in the second degree or voluntary manslaughter based on the lack of evidence of extreme atrocity or cruelty.

The defendant was tried before we prospectively changed the requirements of finding extreme atrocity or cruelty in Commonwealth v. Castillo, 485 Mass. 852, 865-867 (2020).  As a result, the jury were instructed that a finding of extreme atrocity or cruelty must be based on at least one of the so-called Cunneen factors.  See Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983).  "These include '[1] indifference to or taking pleasure in the victim's suffering, [2] consciousness and degree of suffering of the victim, [3] extent of physical injuries, [4] number of blows, [5] manner and force with which delivered, [6] instrument employed, and [7] disproportion between the means needed to cause death and those employed.'"  Commonwealth v. Gonsalves, 488 Mass. 827, 834 (2022), quoting Cunneen, supra.

Based on the evidence that the defendant stabbed the victim -- who was unarmed -- nine times with a knife, causing his intestines to protrude from his body while he lay on the ground conscious and waiting for medical aid, a finding of extreme

atrocity or cruelty was supported by several of the Cunneen factors. See Gonsalves, 488 Mass. at 834-835 (finding of extreme atrocity or cruelty supported where defendant stabbed victim five times and in vital areas, and where, after stabbing, victim was conscious and attempted to speak to friends); Commonwealth v. Rodriquez, 461 Mass. 100, 104-105 (2011) (finding of extreme atrocity or cruelty supported where defendant stabbed unarmed victim seven times with "significant force" in "areas in the body that were likely to cause serious injury and pain"); Commonwealth v. Libby, 405 Mass. 231, 237 (1989), S.C., 411 Mass. 177 (1991) (evidence sufficient to prove extreme atrocity or cruelty where defendant stabbed victim nine times).

The defendant compares this case to Castillo, 485 Mass. at 867-868, where we reduced a verdict of murder in the first degree based on the theory of extreme atrocity or cruelty to murder in the second degree, pursuant to our authority under G. L. c. 278, § 33E. Castillo is inapposite. There, the defendant fired a single gunshot in the victim's back, and the only evidence that supported a finding of extreme atrocity or cruelty was the victim's consciousness of suffering. Id. at 860, 867-868. The same is not true here. See Libby, 405 Mass. at 236 ("Had there been but one stab wound, we might well have regarded this case as one of a class not typically involving

murder in the first degree").  Our "authority to reduce a conviction of murder in the first degree in the interest of justice 'should be used sparingly and with restraint.'" Commonwealth v. Billingslea, 484 Mass. 606, 619-620 (2020), quoting Commonwealth v. Brown, 477 Mass. 805, 824 (2017), cert. denied, 139 S. Ct. 54 (2018).  We decline to exercise that authority in these circumstances.[13]

Conclusion.  We affirm the defendant's convictions and the order denying the defendant's motion for a new trial.

So ordered.

---

[13] The defendant argues that the cumulative effect of the errors requires a new trial.  "Here, 'the cumulative [effect of the] errors . . . [was] no more prejudicial than any individual errors, which had minimal impact, if any.'"  Commonwealth v. Kapaia, 490 Mass. 787, 805 n.15 (2022), quoting Commonwealth v. Duran, 435 Mass. 97, 107 (2001).